IN THE SUPREME COURT OF NORTH CAROLINA

No. 200PA21

Filed 16 June 2023

IN THE MATTER OF: J.M., N.M.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 276 N.C. App. 291 (2021), reversing and remanding an order entered on 17 March 2020 by Judge Burford A. Cherry in District Court, Catawba County. Heard in the Supreme Court on 31 January 2023.

*Lauren Vaughan for petitioner-appellant Catawba County Department of Social Services.*

*Michelle FormyDuval Lynch for appellant Guardian ad Litem.*

*David A. Perez for respondent-appellee mother.*

*Wendy C. Sotolongo, Parent Defender, by J. Lee Gilliam, Assistant Parent Defender, for respondent-appellee father.*

ALLEN, Justice.

As a six-week-old infant, Nellie suffered physical abuse so severe that it left her near death and with brain bleeds, retinal hemorrhages too numerous to count in both of her eyes, and broken ribs.[1] Medical examination revealed that Nellie had suffered at least one of the broken ribs from a prior instance of abuse. Nellie's parents denied abusing Nellie but admitted that they were the only individuals with

---

[1] This opinion uses pseudonyms for juveniles to protect their identities.

unsupervised access to her. The trial court removed Nellie and her one-year-old brother from the parents' custody. Although the parents subsequently participated in training and counseling programs as directed by the court, neither parent accepted responsibility for the harm to Nellie, offered a plausible explanation for her injuries, or expressed any reservations about leaving the children alone with the other parent. Unable to conclude that Nellie and her brother would be safe if returned to their parents, the trial court entered an order removing reunification with the parents from the permanent plan.

The Court of Appeals reversed the trial court, citing the parents' substantial compliance with their case plans and perceived deficiencies in the investigation conducted by the Catawba County Department of Social Services. *In re J.M.*, 276 N.C. App. 291, 856 S.E.2d 904 (2021). Because competent evidence supports the trial court's findings of fact and those findings sustain the trial court's conclusions of law, we reverse the Court of Appeals.

## I.  Background

Respondent-father and respondent-mother lived together in Newton, North Carolina with their two children: Jon, born 20 April 2017, and Nellie, born 3 July 2018. On the morning of 15 August 2018, six-week-old Nellie began crying. Respondent-father fed her and then changed her diaper. Both parents later reported that Nellie had screamed while being changed, though respondent-mother also claimed to have been in another room. Later that morning, Nellie suddenly fell silent.

Respondent-father picked her up and noticed that she had gone completely limp. Nellie then gasped for air and began moving a little and arching her back before going limp again.

Respondents took Nellie to Catawba Valley Medical Center, where a CAT scan showed a subdural hematoma (brain bleed). Nellie was airlifted to Levine Children's Hospital in Charlotte, where she underwent an MRI, a skeletal survey, and examinations by Dr. James LeClair, a radiologist with a subspeciality in neuroradiology, and Dr. Patricia Morgan, a board-certified child abuse pediatrician.

Dr. LeClair observed two areas of bleeding on Nellie's brain and an ischemic infarct (a brain injury caused by oxygen deprivation). The brain bleeds had occurred no more than two days before the MRI and had most likely resulted from serious physical trauma of the sort associated with an automobile accident or a fall from a significant height. An ophthalmologist observed "innumerable" severe multilayer retinal hemorrhages in both of Nellie's eyes. Nellie also had two rib fractures that were the product of blunt force trauma or squeezing. The callous formation on one of the broken ribs indicated that the fracture to that rib was several days old.

Neither Dr. LeClair nor Dr. Morgan saw anything in Nellie's medical history—which included a raised white blood cell count, high blood pressure, and opioid withdrawal—that could account for Nellie's injuries. Dr. Morgan regarded the injuries as strongly indicative of child abuse. Specifically, they were consistent with a shaking incident in which Nellie was squeezed tightly enough to break her ribs and

shaken violently enough to rupture blood vessels in her brain and eyes. The age of one of the rib fractures implied that Nellie had also suffered a previous instance of abuse.

On 21 August 2018, the Catawba County Department of Social Services (Catawba DSS) filed a juvenile petition alleging that Nellie had been abused and that both she and Jon were neglected. The district court entered an order that same day granting Catawba DSS nonsecure custody of Nellie and Jon.

Following several hearings on the petition from May to July 2019, the court declared its adjudication and disposition on 26 August 2019 and filed its adjudication and disposition order on 22 October 2019. The court adjudicated Nellie abused and neglected and adjudicated Jon neglected. It described Nellie's injuries in detail, summarizing the testimony of Dr. LeClair and Dr. Morgan. Consistent with that testimony, the court found that "the constellation of injuries suffered by [Nellie] were the result of nonaccidental trauma, or child abuse." The court likewise found that Nellie's injuries "were not caused by another child or caretaker," basing that finding on respondents' admission to social workers and law enforcement officers that respondents were Nellie's only care providers and that "they were extremely vigilant and rarely allowed others to handle her." Although respondent-mother had two older daughters (approximately ages nine and thirteen at the time of Nellie's hospitalization) by another father, respondents reported that they closely supervised all contact between the girls and Nellie. Respondent-mother did admit to noticing

bruising on Nellie's back and under Nellie's arms about one week before Nellie's hospitalization and asking respondent-father to handle the infant more gently.

Turning to the dispositional phase, the court reviewed the results of respondents' psychological evaluations. The evaluation of respondent-mother revealed that she had experienced significant traumatic events in early childhood for which she needed therapy and that she had "expressed some blame" toward respondent-father for Nellie's injuries. The psychological evaluation of respondent-father did not yield valid outcomes "due to response patterns by [respondent-father] which were indicative of deception." Respondent-father "seemed to have no insight into the fact that he repeatedly finds himself in situations in which he is accused of violence and aggression."

The court further observed that respondent-mother had completed a life skills program and attended a substance abuse treatment program, in which she had progressed from daily sessions to weekly sessions and was on track to progress to biweekly sessions. Respondent-father was attending a mate abuser treatment program, had finished a comprehensive clinical assessment, and was undergoing therapy. Respondents were no longer living together, and both were employed.

In light of its findings of fact, the court concluded that "[r]eturn to the home or custody of either parent [would be] contrary to the best interests, safety and welfare of the [children]" and that "removal of the [children was] necessary." It granted custody of Nellie and Jon to Catawba DSS and directed Catawba DSS to arrange for

foster care or other placement. The court ordered respondents to enter into and comply with case plans requiring psychological evaluations, random drug tests, and life skills programs. It also ordered respondents to maintain stable housing and employment and to refrain from using or possessing illegal drugs. The court allowed each respondent to visit Nellie and Jon for one hour each week.

On 4 November 2019, the court held a permanency planning hearing. In the permanency planning order entered after the hearing, the court remarked on respondents' case plan progress, finding that it was "likely or possible that the minor children [would] return to the home of a parent within six months." Significantly, however, the court cautioned that respondents' failure to explain Nellie's injuries constituted a barrier to reunification. While concluding that returning Nellie and Jon to one or both respondents would be contrary to the children's health, safety, and welfare, the court increased respondents' supervised visitation to three hours per week. The permanency planning order made reunification the primary plan and adoption the secondary plan.

A second permanency planning hearing took place on 12 February 2020. Catawba DSS and the guardian ad litem submitted new reports to the court. The report by Catawba DSS recommended maintaining a primary plan of reunification with a secondary plan of adoption. The guardian ad litem's report recommended a primary plan of adoption with a secondary plan of reunification.

The court heard testimony from respondents and the children's foster mother.

During her testimony, respondent-mother conceded that Nellie's injuries were "nonaccidental," but she denied knowing how they had happened. She insisted that, although respondent-father might have been a danger to Nellie and Jon at some point, he no longer posed any threat. When asked what her plan would be if reunited with her children, respondent-mother said that she wanted to share custody with respondent-father and that she would have no concerns about leaving Nellie and Jon alone with him. Respondent-father again denied knowing the cause of Nellie's injuries but opined that some of them had resulted from a bowel movement. The foster mother testified that respondents had demonstrated a good bond with the children, that Nellie and Jon had enjoyed their visits with respondents, and that she had never seen either respondent engage in any inappropriate behavior.

In the permanency planning order entered after the 12 February 2020 hearing, the court acknowledged the continued progress of respondents on their case plans. Respondent-mother had received counseling for substance abuse and domestic violence, attended a substance abuse treatment program, screened negative for drugs at each test, completed several life skills and parenting courses, and maintained employment and her own residence. Similarly, respondent-father had undergone a second psychological evaluation and additional therapy, participated in the mate abuser treatment program and domestic violence classes, and screened negative for drugs consistently after failing his first drug test.

Despite the progress on case plans and the foster mother's positive assessment,

the trial court expressed concern that, "[w]ithout some acknowledgement by the parents of responsibility for the injuries, there can be no mitigation of the risk of harm to the children." According to the court, respondent-mother essentially took the position that, even "if the father was a danger to the child at the time of the removal, he is not a danger now." The court also characterized as "disturbing" some of the statements made by respondent-father during his second psychological evaluation, especially the following: "To my knowledge, nothing malicious happened. Experts have conflicting information regarding dates and timelines of injuries. I've ruled out that [respondent-mother] had anything to do with it . . . . My daughter had medical issues before this."

Given the severity of Nellie's injuries and that neither respondent had "acknowledged responsibility for th[e] nonaccidental abusive injuries to [Nellie]," the court found "no evidence that either parent w[ould] protect their children over protecting one another, and therefore the risk to these children of abuse and neglect remain[ed] high." Under the circumstances, the court deemed it unlikely that Nellie and Jon would return home within six months. The court concluded that returning the children home would be contrary to their health, safety, and welfare and that efforts to reunify them with either respondent "would clearly be unsuccessful and inconsistent with the children's health and safety." The court modified the permanent plan, eliminating reunification from the plan and specifying a primary plan of adoption and guardianship and a secondary plan of custody with an approved family

member. Nonetheless, unconvinced that adoption would prove to be in the children's best interest "due to the bond with their parents," the court determined that Catawba DSS should not initiate proceedings to terminate respondents' parental rights. The court maintained respondents' visitation and ordered a home study of the paternal grandmother for potential placement.

Respondents appealed the trial court's second permanency planning order. A unanimous panel of the Court of Appeals held that the findings of fact in the order were not supported by competent evidence and that the findings did not support the trial court's conclusion that reunification efforts would be contrary to the children's health, safety, and need for a permanent home. *In re J.M.*, 276 N.C. App. at 302–04, 856 S.E.2d at 912–13. The Court of Appeals likewise held that the trial court could not lawfully precondition reunification on an admission of fault by respondents without first finding that respondents had forfeited their constitutional rights to the custody, care, and control of their children. *Id.* at 308, 856 S.E.2d at 915.

Pursuant to Rule 31 of the North Carolina Rules of Appellate Procedure, Catawba DSS and the guardian ad litem filed a petition for rehearing with the Court of Appeals. The Court of Appeals denied the petition, whereupon Catawba DSS and the guardian ad litem filed a petition for discretionary review with this Court under N.C.G.S. § 7A-31 (2021). We allowed the petition.

## II. Standard of Review

Appellate review of a trial court's permanency planning order is restricted "to

whether there is competent evidence in the record to support the findings [of fact] and whether the findings support the conclusions of law." *In re A.P.W.*, 378 N.C. 405, 410, 861 S.E.2d 819, 825 (2021) (alteration in original) (quoting *In re H.A.J.*, 377 N.C. 43, 49, 855 S.E.2d 464, 469 (2021)). "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding." *State v. Ashworth*, 248 N.C. App. 649, 651, 790 S.E.2d 173, 176 (2016) (quoting *State v. Chukwu*, 230 N.C. App. 553, 561, 749 S.E.2d 910, 916 (2013)). At a permanency planning hearing, competent evidence may consist of "any evidence, including hearsay evidence . . . or testimony or evidence from any person that is not a party, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C.G.S. § 7B-906.1(c) (2021).

"The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *In re A.P.W.*, 378 N.C. at 410, 861 S.E.2d at 825. Uncontested findings of fact are likewise binding on appeal. *In re D.W.P.*, 373 N.C. 327, 330, 838 S.E.2d 396, 400 (2020). Moreover, "[t]he trial [court's] decisions as to the weight and credibility of the evidence, and the inferences drawn from the evidence[,] are not subject to appellate review." *Id.*

"The trial court's dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion." *In re A.P.W.*, 378 N.C. at 410, 861 S.E.2d at 825–26. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not

have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). "In the rare instances when a reviewing court finds an abuse of . . . discretion, the proper remedy is to vacate and remand for the trial court to exercise its discretion. The reviewing court should not substitute its own discretion for that of the trial court." *In re A.J.L.H.*, 384 N.C. 45, 48, 884 S.E.2d 687, 690 (2023).

## III.    Analysis

### A.  Removal of Reunification from the Permanent Plan

The provisions in Chapter 7B (Juvenile Code) of our General Statutes "reflect[ ] the need both to respect parental rights and to protect children from unfit, abusive, or neglectful parents." *In re R.T.W.*, 359 N.C. 539, 543, 614 S.E.2d 489, 492 (2005). The Juvenile Code divides abuse, neglect, and dependency proceedings into two main phases: adjudicatory and dispositional. During the adjudicatory phase, the burden of proof is on DSS to show by clear and convincing evidence that a juvenile qualifies as abused, neglected, or dependent as the Juvenile Code defines those terms. N.C.G.S. § 7B-805 (2021). If the court adjudicates the juvenile abused, neglected, or dependent, proceedings move to the dispositional phase, the purpose of which "is to design an appropriate plan to meet the needs of the juvenile and to achieve the objectives of the State in exercising jurisdiction." N.C.G.S. § 7B-900 (2021).[2]

This case involves a challenge to rulings made in the dispositional phase. Respondents have not disputed the trial court's adjudications of abuse and neglect.

---

[2] The objectives of the Juvenile Code are set out in N.C.G.S. § 7B-100.

During the dispositional phase, the court may select among or combine various alternatives for disposition: dismissal or continuance of the case; supervision of the juvenile in the juvenile's home by DSS or another individual, subject to conditions specified by the court; placement of the juvenile in the custody of a parent, relative, private agency, or some other suitable person; appointment of a guardian of the person for the juvenile; or placement of the juvenile in DSS's custody. N.C.G.S. § 7B-903(a) (2021).

There is no burden of proof at the dispositional phase. Rather, "[t]he essential requirement, at the dispositional hearing . . . , is that sufficient evidence be presented to the trial court so that it can determine what is in the best interest of the child." *In re Shue*, 311 N.C. 586, 597, 319 S.E.2d 567, 574 (1984); *see also* N.C.G.S. § 7B-100(5) (2021) (explaining that one purpose of the Juvenile Code is "[t]o provide standards . . . for ensuring that the best interests of the juvenile are of paramount consideration by the court and that when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time"). Moreover, "[t]he court may consider any evidence, including hearsay evidence . . . , that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition." N.C.G.S. §§ 7B-901(a), 7B-906.1(c) (2021).

The first step in the dispositional phase is the initial disposition hearing, which the court must hold immediately following the adjudicatory hearing and complete

within thirty days of finishing the adjudicatory hearing. N.C.G.S. § 7B-901(a) (2021). Depending on the trial court's custody decision at the initial disposition hearing, the case goes on either the review hearing track or the permanency planning track. When, as in this case, the court removes custody of the juvenile from a parent, guardian, or custodian at the initial disposition hearing, the statutory provisions regarding permanency planning apply. The court must conduct a permanency planning hearing within ninety days of the initial disposition hearing and, in general, follow-up permanency planning hearings at least every six months as long as it retains jurisdiction over the matter.[3] The permanent plan adopted by the court must contain a primary plan and a secondary plan. N.C.G.S. § 7B-906.2(b) (2021). The most common primary and secondary plans include reunification of the juvenile with his or her parent(s), adoption, guardianship with relatives or others, and custody to a relative or other suitable person.[4] N.C.G.S. § 7B-906.2(a) (2021).

The goal of the permanency planning process is to "return the child to their home or when that is not possible to a safe, permanent home within a reasonable period of time." Sara DePasquale, *Abuse, Neglect, Dependency, and Termination of Parental Rights Proceedings in North Carolina* 7-10 (UNC School of Government

---

[3] The court must hold the first permanency planning hearing within thirty days of the initial disposition when the initial disposition relieves DSS of making reasonable efforts to reunite the juvenile with his or her parent(s). N.C.G.S. § 7B-901(d) (2021).

[4] The other options listed in N.C.G.S. § 7B-906.2(a) are Another Planned Permanent Living Arrangement for a juvenile who is sixteen or seventeen years old and reinstatement of parental rights pursuant to N.C.G.S. § 7B-1114.

2022). Accordingly, reunification ordinarily must be the primary or secondary plan in a juvenile's permanent plan. N.C.G.S. § 7B-906.2(b). The court must make written findings at each permanency planning hearing regarding certain factors used to evaluate progress—or the lack thereof—toward reunification:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, [DSS], and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, [DSS], and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C.G.S. § 7B-906.2(d) (2021).

The requirement to make reunification the primary or secondary plan is not absolute. The court need not pursue reunification during the permanency planning process if: (1) the court made written findings specified in N.C.G.S. § 7B-901(c) at the initial disposition hearing; (2) the court made written findings described in N.C.G.S. § 7B-906.1(d)(3) at a review hearing or an earlier permanency planning hearing; (3) the permanent plan has been achieved; or (4) "the court makes written findings that reunification efforts clearly would be unsuccessful or . . . inconsistent with the juvenile's health or safety." N.C.G.S. § 7B-906.2(b). The court's written findings do not have to track the statutory language verbatim, but they "must make clear that the trial court considered the evidence in light of whether reunification would be

[clearly unsuccessful] or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *In re H.A.J.*, 377 N.C. at 49, 855 S.E.2d at 470.[5]

**B. Inconsistency of Reunification Efforts with Juveniles' Health and Safety**

The trial court eliminated reunification from the permanent plan for Nellie and Jon after concluding that returning them to the custody of their parents would be "contrary to the health, safety and welfare of the children" and that "[f]urther efforts to reunify the children with either parent would clearly be unsuccessful and inconsistent with the children's health and safety." The court based its conclusion on the failure of respondents to acknowledge responsibility for the extreme abuse that left Nellie fighting for her life at six weeks old. In the court's view, without some acknowledgement of responsibility, there was no reason to believe that "either parent [would] protect their children over protecting one another, and therefore the risk to these children of abuse and neglect remain[ed] high."

In reversing the trial court, the Court of Appeals held that the evidentiary record does not prove by clear and convincing evidence that reunification efforts would be futile.[6] The Court of Appeals noted that respondent-mother had "complied

---

[5] Although *In re H.A.J.* and other permanency planning cases cite to *In re L.M.T.*, 367 N.C. 165, 752 S.E.2d 453 (2013), that case interprets provisions in the Juvenile Code as they existed prior to amendments enacted in 2015. It should not be relied upon going forward.

[6] In 2015 and 2016, the General Assembly amended the Juvenile Code to remove all references to "futile." In its place, the General Assembly adopted the language "clearly would be unsuccessful or inconsistent with the juvenile's health or safety." *Compare* N.C.G.S. §§ 7B-

with and substantially completed her case plan; acknowledged what brought Jon and Nellie into DSS's care; and exhibited changed behaviors, including installing safeguards in the familial home and requiring [r]espondent-[f]ather to move out of the home." *In re J.M.*, 276 N.C. App. at 302, 856 S.E.2d at 912. Additionally, respondent-mother had "engaged in all services required of her in order to correct the conditions that led to the removal of the children." *Id.* With respect to respondent-father, the Court of Appeals observed that he had "participated in and completed services; . . . that [r]espondent-[m]other and the children's foster mother . . . did not have safety concerns about [him]; and . . . [that he] had completed all the weekly sessions in the Mate Abuser Treatment Program." *Id.* at 304, 856 S.E.2d at 913. The Court of Appeals also concluded that Catawba DSS had failed to make reasonable efforts towards reunification by not interviewing respondent-mother's two older children, both of whom "resided in the familial home with [r]espondents, Jon, and Nellie."[7] *Id.* at 307, 856 S.E.2d at 915.

In their briefs to this Court, Catawba DSS and the guardian ad litem argue that the Court of Appeals ignored pertinent precedents from this Court with comparable fact patterns. They further argue that the Court of Appeals should not have considered the alleged shortcomings in the investigation by Catawba DSS

---

906.1 (2016), -507 (2015), *with* N.C.G.S. §§ 7B-906.1 (2015), -507 (2013). *See also* N.C.G.S. § 7B-906.2(b) (2015).

[7] In their petition for rehearing filed with the Court of Appeals, Catawba DSS and the guardian ad litem alleged that, in fact, Catawba DSS did interview respondent-mother's older daughters.

because respondents did not appeal the trial court's adjudication order.

Insisting that the Court of Appeals should be affirmed, respondents attempt to distinguish this case from the precedents cited by Catawba DSS and the guardian ad litem. They argue that the Court of Appeals did not engage in impermissible factfinding as to the Catawba DSS investigation. Respondent-mother contends that no competent evidence supports the trial court's conclusion that she would not protect the children, if necessary, from respondent-father. Respondent-father maintains that removing reunification from the permanent plan over his refusal to acknowledge guilt is fundamentally unfair and at odds with the children's best interest.

We hold that the Court of Appeals erred in reversing the trial court's decision to eliminate reunification from the permanent plan. As explained below, binding precedent required the Court of Appeals to affirm.

### 1. *Sufficiency of Catawba DSS's Reunification Efforts*

"Unless reunification efforts were previously ceased, at each permanency planning hearing the court shall make a finding about whether the reunification efforts of the county [DSS] were reasonable." N.C.G.S. § 7B-906.2(c) (2021). State law defines "reasonable efforts" towards reunification to demand

> [t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time. If a court of competent jurisdiction determines that the juvenile is not to be returned home, then reasonable efforts means the diligent and timely use of permanency planning services by a department of social

services to develop and implement a permanent plan for
the juvenile.

N.C.G.S. § 7B-101(18) (2021).

In concluding that further reunification efforts "would clearly be unsuccessful
and inconsistent with the children's health and safety," the trial court partly relied
on these key findings of fact that appear in its adjudication order:

> 24. Both parents reported to social workers and police that
> only they provided care to [Nellie], that they were
> extremely vigilant and rarely allowed others to handle her.
> The parents reported, and the court finds, that the parents
> supervised contact between Ms. Smith's older daughters
> and [Nellie] very closely, as well as contact between [Nellie]
> and [Jon]. The parents reported, and the court finds that
> [Jon] was never left alone with [Nellie]. Based on the
> parents' statements, the Court finds that the injuries to
> [Nellie] were not caused by another child or caretaker.
>
> . . . .
>
> 28. The Court specifically finds, after considering all of the
> evidence, that the constellation of injuries suffered by the
> minor child [Nellie] were the result of nonaccidental
> trauma, or child abuse.

Taken together, the above findings of fact establish that (1) Nellie's life-
threatening injuries resulted from intentional conduct and (2) no one other than
respondents could have inflicted the injuries. The trial court based its finding of
intentional conduct on the testimony of the medical experts who treated Nellie.
Respondents' own statements to social workers and law enforcement officers
informed the finding that no other caregiver or child could have abused Nellie.

In holding that Catawba DSS did not make reasonable efforts to reunify

respondents with Nellie and Jon, the Court of Appeals focused on the alleged failure

of Catawba DSS to interview respondent-mother's two older children. The Court of

Appeals speculated that the interviews might have provided an explanation for

Nellie's injuries that would have exonerated respondents.

> DSS offers no reason why it failed to interview
> Respondent-Mother's older children. The trial court found,
> in the adjudication order, Jon and Nellie were under
> Respondents' exclusive custody and care based on the
> statements made by the Respondents to social workers and
> police regarding their care of Nellie. It is unreasonable to
> presume, however, that parents have eyes on their children
> at all times. Parents and children must sleep at some point,
> and presumably, parents must tend to other children or to
> household needs, allowing for children to be left without
> eyes-on supervision for some periods of time, no matter
> how short.

*In re J.M.*, 276 N.C. App. at 306, 856 S.E.2d at 914.

Regardless of whether Catawba DSS interviewed respondent-mother's two

older children, precedent required the Court of Appeals to treat the findings of fact in

the adjudication order as binding on appeal. In *In re Wheeler,* the trial court's order

adjudicating two children abused and neglected found that their father had sexually

abused them. 87 N.C. App. 189, 191–93, 360 S.E.2d 458, 459–61 (1987). The father

did not appeal the adjudication order, and when the county DSS filed a petition to

terminate his parental rights, the trial court prohibited the parties from relitigating

the sexual abuse issue. *Id.* at 192, 360 S.E.2d at 460. The Court of Appeals upheld

the trial court's refusal to revisit the adjudication order's abuse finding: "[b]ecause no

appeal was taken or other relief sought from the [adjudication] order, it remained a

valid final order which was binding in the later proceeding on the facts regarding abuse and neglect which were found to exist at the time it was entered." *Id.* at 194, 360 S.E.2d at 461; *see also In re N.G.*, 186 N.C. App. 1, 4, 650 S.E.2d 45, 48 (2007) (holding that the trial court's earlier findings of abuse barred the parents from denying responsibility for injuring their oldest child in a later proceeding), *aff'd*, 362 N.C. 229, 657 S.E.2d 355 (2008).

Here, respondents have appealed the trial court's permanency planning order that eliminated reunification from the permanent plan for Nellie and Jon. Like the father in *Wheeler*, they did not exercise their right to appeal or to seek other appropriate relief from the adjudication order. *See* N.C.G.S. § 7B-1001(a)(3) (2021) (allowing a direct appeal to the Court of Appeals from "[a]ny initial order of disposition and the adjudication order upon which it is based"). Although *Wheeler* is not binding on this Court, it remains controlling authority for the Court of Appeals. *See In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court."). For this reason, the Court of Appeals should not have allowed respondents to transform their appeal from the permanency planning order into a collateral attack on findings of fact in the adjudication order.

The trial court's findings of fact in the adjudication order indicate that no one other than respondents could have inflicted Nellie's life-threatening injuries. The

Court of Appeals was constrained by these findings during its review of the permanency planning order on appeal in this case. *See, e.g.*, *In re A.P.W.*, 378 N.C. 405, 410, 861 S.E.2d 819, 825 (2021) ("Uncontested findings [of fact] are binding on appeal."); *In re D.W.P.*, 373 N.C. 327, 330, 838 S.E.2d 396, 400 (2020) ("Unchallenged findings of fact made at the adjudicatory stage . . . are binding on appeal.").

### 2. *Sufficiency of Permanency Planning Order's Findings of Fact and Conclusions of Law*

Citing respondent-mother's compliance with her case plan, changed behaviors, and participation in mandated services, the Court of Appeals held that the trial court's "findings and conclusions of law that reunification efforts would be futile is unsupported by clear and convincing evidence." *In re J.M.*, 276 N.C. App. at 302, 856 S.E.2d at 912. Similar factors persuaded the Court of Appeals that, with respect to respondent-father, the trial court's second permanency planning order "does not make 'findings that embrace the requisite ultimate finding that reunification efforts clearly would be unsuccessful or . . . inconsistent with the juvenile's health or safety.' " *Id.* at 304, 856 S.E.2d at 913 (quoting *In re D.A.*, 258 N.C. App. 247, 254, 811 S.E.2d 729, 734 (2018)).

Due regard for our own precedent requires us to reverse the Court of Appeals. In *In re D.W.P.*, the Guilford County Department of Health and Human Services (GCDHHS) initiated juvenile proceedings after the mother's infant son received emergency medical treatment for a broken femur. 373 N.C. at 328, 838 S.E.2d at 399.

The mother and her then-fiancé were the infant's only caregivers when the injury occurred. *Id.* at 328, 838 S.E.2d at 399. Medical examination revealed older clavicle, tibia, fibula, and rib fractures that were still in the process of healing. *Id.* The mother offered various explanations for the injuries, all of which shifted blame away from her and her fiancé. *Id.* She first blamed the family dog for the broken femur and suggested that the infant's biological father—not her fiancé—had inflicted the older injuries. *Id.* The mother later said that the infant's injuries "may have occurred because he 'slept funny.' " *Id.* at 329, 838 S.E.2d at 399. While she eventually admitted that her fiancé might have been alone with her son at some point on the night of the femur injury, the mother remained unwilling to implicate anyone other than the infant's biological father. *Id.* at 336, 838 S.E.2d at 404.

The trial court adjudicated the infant abused and neglected and adjudicated the mother's four-year-old daughter neglected.[8] *Id.* at 328, 838 S.E.2d at 399. Following a permanency planning hearing that resulted in an order to cease reunification efforts, GCDHHS filed a petition to terminate the mother's parental rights under Article 11 (Termination of Parental Rights) of the Juvenile Code. *Id.* at 329, 838 S.E.2d at 399. The trial court held a hearing on the petition and entered an

---

[8] The mother appealed the trial court's adjudication order. The Court of Appeals affirmed the adjudication of the son as abused and neglected but reversed the daughter's neglect adjudication, remanding the case "with instructions to the trial court to make appropriate findings of fact and conclusions of law to determine whether [the daughter was] a neglected juvenile." *In re D.P. and B.P.*, No. COA16-529, slip op. at 13 (N.C. Ct. App. Nov. 15, 2016) (unpublished). In subsequent proceedings, the mother stipulated that her daughter was neglected. *In re D.W.P.*, 373 N.C. at 329.

order terminating the mother's parental rights. *Id.* The order found as fact that either the mother or her (by then former) fiancé had abused her son. *Id.* at 329, 838 S.E.2d at 400. Conceding that the mother had satisfied many of the permanent plan's requirements, the termination order emphasized her failure to offer an honest explanation for her son's injuries. *Id.* at 329, 838 S.E.2d at 399–400. Absent such an explanation, the court believed, GCDHHS could not formulate a plan "to ensure that injuries would not occur in the future." *Id.* at 329, 838 S.E.2d at 400.

On appeal, we rejected the mother's contention that the findings of fact in the termination order were unsupported by clear, cogent, and convincing evidence, the evidentiary standard at the adjudicatory phase of termination proceedings. *Id.* at 331–38, 838 S.E.2d at 401–05; s*ee also* N.C.G.S. § 7B-1109(f) (2021) ("The burden in [an adjudicatory hearing on termination] shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence."). In particular, we upheld the trial court's finding that the mother had not gained insight into the cause of her son's injuries.

> Respondent-mother has maintained that she does not know the cause of [her son's] injuries and has offered explanations that are not medically supported. She acknowledged that she would not rule out the possibility that [her fiancé] committed the injuries . . . but she also admits to resuming contact with him after the children were taken from the home. While we recognize that respondent-mother has taken the proper steps to attend parenting classes and therapy[ ] and has followed the majority of the court's recommendations to become a better parent, she has failed to acknowledge the harm that has resulted from her failure to identify what happened to [her

son]. Without recognizing the cause of [her son's] injuries, respondent-mother cannot prevent them from reoccurring. Therefore, the trial court's finding that respondent-mother failed to gain insight and make reasonable progress regarding [her son's] injuries is supported by clear, cogent and convincing evidence.

*In re D.W.P.*, 373 N.C. at 338, 838 S.E.2d at 404–05.

This Court went on to hold that the findings of fact supported the trial court's conclusion that grounds existed under N.C.G.S. § 7B-1111(a)(1) to terminate the mother's parental rights for neglect.

> While we recognize the progress respondent-mother has made in completing her parenting plan, including completing parenting classes, attending therapy, and regularly visiting with her children, we are troubled by her continued failure to acknowledge the likely cause of [her son's] injuries. . . .
>
> Here, the findings of fact show that respondent-mother has been unable to recognize and break patterns of abuse that put her children at risk. Despite respondent-mother's acknowledgement that [her fiancé] could have caused [her son's] injuries, she re-established a relationship with him that resulted in domestic violence [before finally marrying someone else]. Respondent-mother acknowledges her responsibility to keep [her son] safe, but she refuses to make a realistic attempt to understand how he was injured or to acknowledge how her relationships affect her children's wellbeing. These facts support the trial court's conclusion that the neglect is likely to reoccur if the children are returned to respondent-mother's care.

*Id.* at 339–40, 838 S.E.2d at 406.

The parallels between *In re D.W.P.* and this case are obvious and compelling. Each case involves the serious physical abuse of an infant at home and in the care of

two adults. In each case, the trial court found that the two caregivers were the only persons who could have inflicted the abuse. Moreover, while the mother in each case suggested that she was elsewhere in the home when the abuse took place, she refused to blame her partner or to supply any other plausible explanation for the infant's injuries. The explanations that were offered in each case bordered on the absurd, with the mother in *In re D.W.P.* blaming the family dog or strange sleep positions for the harm to her child and respondent-father in the present case theorizing that a difficult bowel movement accounted for Nellie's injuries. In each case, the trial court found that parental inability or unwillingness to confront the cause of the abuse prevented the parent(s) from adequately mitigating the risk of further abuse or neglect.

To be sure, there are factual differences between *In re D.W.P.* and this case. Respondent-mother has done a better job of complying with her case plan and availing herself of services than the mother in *In re D.W.P.* Furthermore, there is no evidence in the record that respondent-mother has been a party to any post-removal incidents of domestic violence, unlike the mother in *In re D.W.P.*, whose homelife after her child's hospitalization was marred by such incidents.

Major distinctions between the two cases only strengthen the arguments for upholding the trial court, however. Whereas the mother in *In re D.W.P.* ultimately ended her relationship with the only other person who could have inflicted her son's injuries, respondent-mother made it clear during the second permanency planning hearing that she desires to share custody of Nellie and Jon with respondent-father

and has no reservations about leaving the children alone with him. If we assume for the sake of argument that respondent-mother did not injure Nellie, this means that she is willing to entrust her children unsupervised to the person who physically abused Nellie twice—the second time so badly that he nearly killed her—and who has thus far refused to accept any degree of responsibility for his actions. Of course, if we assume that respondent-mother abused Nellie, there is no reason to believe that respondent-father would protect the children from her. According to him, Nellie was not abused at all.

Additionally, *In re D.W.P.* concerned the termination of parental rights—a final order—not a permanency planning order, which can be modified at any time in response to new developments in a case. The permanency planning order on appeal here does not foreclose the possibility that one or both respondents might one day regain custody of Nellie and Jon. Indeed, the order expressly finds that termination of parental rights would not be in the children's best interest. It stands to reason that evidence sufficient to support the termination of parental rights is sufficient to sustain the less dramatic step of removing reunification from a permanent plan.

Just as the evidence in *In re D.W.P.* supported the findings of fact and conclusions of law in the trial court's termination order, the record evidence in this case provides ample basis for the trial court's determination that respondents' persistent unwillingness to acknowledge responsibility for Nellie's life-threatening injuries would render further efforts at reunification clearly unsuccessful and

"inconsistent with the [juveniles'] health or safety." N.C.G.S. § 7B-906.2(b). The Court of Appeals should have followed *In re D.W.P.* and upheld the findings of fact and conclusions of law in the permanency planning order.[9]

## C. Non-Preservation of Constitutional Claim

The Court of Appeals held that "[t]he trial court's insistence for [r]espondents to admit blame as a . . . basis to cease reunification has no lawful basis without the threshold finding of unfitness or conduct inconsistent with their constitutionally protected status as a parent." *In re J.M.*, 276 N.C. App. at 308, 856 S.E.2d at 915. Because the trial court did not make any such findings regarding respondents' constitutional rights, the Court of Appeals reasoned that the trial court erred by removing reunification from the permanent plan. We disagree.

This Court has long recognized that "a parent enjoys a fundamental right 'to make decisions concerning the care, custody, and control' of his or her children under the Due Process Clause of the Fourteenth Amendment to the United States

---

[9] Our opinion should not be understood to hold that a parent's refusal to acknowledge responsibility for abuse will always sustain a conclusion that reunification efforts would clearly be unsuccessful or inconsistent with a child's health or safety. Rather, we simply hold that the facts of this case, which so closely resemble those of *D.W.P.*, support such a conclusion. In both cases, the evidence provided the trial court with grounds to believe that the parent(s) did not appreciate the seriousness of the abuse and would not be willing to take the steps necessary to keep the children safe.

Neither do we hold that the trial court was *required* by its findings of fact and conclusions of law to remove reunification from the permanent plan. Even when grounds exist to eliminate reunification from a permanent plan, the decision to eliminate or retain reunification lies within the trial court's sound discretion. *See In re A.P.W.*, 378 N.C. at 410, 861 S.E.2d at 825–26 ("The trial court's dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion.").

Constitution." *Adams v. Tessener*, 354 N.C. 57, 60, 550 S.E.2d 499, 501 (2001) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). To that end, "absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount rights of parents to custody, care, and control of their children must prevail." *Petersen v. Rogers*, 337 N.C. 397, 403–04, 445 S.E.2d 901, 905 (1994). Nonetheless, "the existence of a constitutional protection does not obviate the requirement that arguments rooted in the Constitution be preserved for appellate review." *In re J.N.*, 381 N.C. 131, 133, 871 S.E.2d 495, 497 (2022); *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39 (2002) ("It is well settled that an error, even one of constitutional magnitude, that [the party] does not bring to the trial court's attention is waived and will not be considered on appeal.").

In *In re J.N.*, "DSS sought to change the primary plan from reunification to guardianship with an approved caregiver." 381 N.C. at 132, 871 S.E.2d at 497. Although the father argued during the permanency planning hearing "that reunification should remain the primary plan[, he] did not argue or otherwise contend that the evidence failed to demonstrate he was an unfit parent or that his constitutionally-protected right to parent his children had been violated." *Id.* The trial court entered an order granting guardianship of the children to their grandparents. *Id.*

On appeal, the father argued "that the trial court erred in granting guardinship to the maternal grandparents without first finding that he was an unfit

parent or he had acted inconsistently with his constitutional right to parent." *Id.* Affirming the trial court, this Court held that the issue had not been preserved for appellate review because the father had "failed to assert his constitutional argument in the trial court." *Id.* at 133, 871 S.E.2d at 498. In so ruling, we noted that the father "was on notice that DSS and the guardian ad litem were recommending that the trial court change the primary permanent plan in th[e] case from reunification to guardianship." *Id.* at 133–34, 871 S.E.2d at 498. "Despite having [notice and] the opportunity to argue or otherwise assert that awarding guardianship to the maternal grandparents would be inappropriate on constitutional grounds, [the father] failed to do so." *Id.* at 134, 871 S.E.2d at 498.

Similarly, in this case, the guardian ad litem filed a report prior to the permanency planning hearing recommending that reunification be removed as the primary plan inasmuch as "the cause of [Nellie's] injuries remain[ed] unexplained." When the trial court announced at the hearing that it was contemplating eliminating reunification from the permanent plan, it gave the parties a thirty-minute recess to consider their responses. Notwithstanding the pre-hearing notice that reunification would be on the table and the 30-minute recess, respondents at no point during the permanency planning hearing argued that the proposed changes to the permanent plan would be improper on constitutional grounds. Consequently, they did not preserve the issue for appellate review. *Id.* ("Despite having the opportunity to argue or otherwise assert that awarding guardianship to the maternal grandparents would

be inappropriate on constitutional grounds, respondent failed to do so. Therefore, respondent waived the argument for appellate review.").

### IV.    Conclusion

In this case, the trial court removed two young children from the custody of their parents after one or both parents inflicted life-threatening injuries on the youngest child, then just six weeks old. Faced with the gravity of the abuse and the persistent unwillingness of either parent to admit responsibility or to fault the other, the trial court determined that reunification with the parents would be inconsistent with the children's health and safety. The evidence in this case supports the trial court's findings of fact, and those findings support the conclusions of law in the permanency planning order. Furthermore, the constitutional issue addressed by the Court of Appeals was not preserved for appellate review. We therefore reverse the decision of the Court of Appeals.

REVERSED.

Justice MORGAN concurring in part and dissenting in part.

I join my esteemed colleagues in the majority to the extent that they conclude that the trial court did not err by eliminating reunification from the permanency plan for Nellie and Jon with regard to respondent-father and to the extent that they discuss the sufficiency of Catawba County DSS's reunification efforts and the non-preservation of respondent-father's constitutional argument. However, I disagree with the majority's conclusion that the trial court made sufficient findings to support its conclusion that efforts to reunify the two youngsters with respondent-*mother* would be unsuccessful or inconsistent with the children's health and safety. Specifically, the trial court's sole grounds for reaching this conclusion were that respondent-mother had failed either to take responsibility herself for injuring Nellie or to offer "any better explanation" for the manner in which Nellie's injuries had occurred. I would hold that respondent-mother's inability to provide a more specific explanation for how Nellie's injuries had occurred, under the facts and circumstances existent in this case, provided an insufficient basis for the trial court's conclusion that further reunification efforts would be clearly unsuccessful or inconsistent with the health and safety of both Nellie and Jon when respondent-mother otherwise took sufficiently reasonable steps to ensure the health and safety of the children including, but not limited to, separating residences from respondent-father. *See* N.C.G.S. § 7B-

906.2(b) (2019). I would therefore affirm the Court of Appeals to the extent that the lower appellate court reversed the trial court's order on these grounds.

As the majority here readily acknowledges, the overarching goal of the permanency planning process is to "return the child to their home" or, only when such an outcome is not possible, to instead deliver the child "to a safe, permanent home within a reasonable period of time." Sara DePasquale, *Abuse, Neglect, Dependency, and Termination of Parental Rights Proceedings in North Carolina* 7-10 (UNC School of Government 2022). Accordingly, the North Carolina General Statutes directs as follows:

> Reunification shall be a primary or secondary plan unless the court made findings under G.S. 7B-901(c) or G.S. 7B-906.1(d)(3), the permanent plan is or has been achieved in accordance with subsection (a1) of this section, or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.

N.C.G.S. § 7B-906.2(b) (2019).[1] As such, the trial court must make findings of fact as to each of the following factors which tend to indicate the success or failure of reunification efforts at all permanency planning hearings:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.

---

[1] The applicable statute was amended in 2021 to add the word "written" before the first occurrence of the word "findings," which did not appear in the 2019 version that was applied by the lower appellate court in its review of this case. This update has no impact on the majority's analysis of the pertinent legal issues.

   (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.

   (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.

   (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

*Id.* § 7B-906.2(d) (2019). The trial court's findings "must make clear that the trial court considered the evidence in light of whether reunification would be [clearly unsuccessful] or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *In re H.A.J.*, 377 N.C. 43, 49 (2021) (citation omitted).

In the present case, the trial court made the following findings of fact that tended to either support or contradict its conclusion that further reunification efforts between respondent-mother and the two children would be clearly unsuccessful or inconsistent with the juveniles' health and safety:

   9. The Mother continues to attend substance abuse treatment at Addiction Recovery Medical Services (ARMS), where she had progressed from daily sessions, to weekly sessions, and will soon progress to biweekly sessions. The Mother has screened negative for all eighteen drug screens since her children entered foster care.

   10. The Mother has completed the Life Skills program and Triple P Parenting, an online course. She has provided two certificates of completion for Raising Confident, Competent Children and Raising Resilient Children, both in October 2019.

11. The Mother completed a Comprehensive Clinical Assessment at Family Net on October 7, 2019. She was recommended weekly outpatient therapy and has been compliant.

. . . .

14. The parents are living separate and apart from each other. The mother resides in the home that she . . . once shared with her children and their father. The Father has an independent residence.

. . . .

20. The purpose of the parents' case plans is to address the issue that brought these children before the Court and into foster care, i.e. the nona[c]cidental traumatic and life-threatening injuries to the minor child [Nellie] while in the care of her parents. As of this date, neither parent has offered any better explanation for these injuries than they offered at the adjudication of this matter or at any hearing since. Without some acknowledgement by the parents of responsibility for the injuries, there can be no mitigation of the risk of harm to the children.

21. *In her testimony today, the Mother has stated that she acknowledges that her child suffered nonaccidental injury; however, she does not know how. Her position is that, if the father was a danger to the child at the time of the removal, he is not a danger now.*

. . . .

23. The injuries to the minor child [Nellie] which brought these children before the Court included two subdural hematomas caused by abusive head trauma, equivalent to a motor vehicle accident or fall from a significant height. In addition, she sustained multiple retinal hemorrhages (described as too many to count), and a posterior rib fracture[ ] that occurred days prior to her brain bleeds. *Although the parents have participated*

> *and completed services, neither has acknowledged responsibility for these nonaccidental abusive injuries to [Nellie]. Without that acknowledgment, the Court has no evidence that either parent will protect their children over protecting one another, and therefore the risk to these children of abuse and neglect remains high.*

(Emphases added.) From these findings, the trial court drew its conclusion that "[f]urther efforts to reunify the children with either parent would clearly be unsuccessful and inconsistent with the children's health and safety[.]"

On review, the Court of Appeals held, *inter alia,* that this conclusion, as it applied to respondent-mother, was not consistent with the evidence presented because this evidence tended to suggest that respondent-mother had (1) substantially complied with and completed her case plan, (2) required respondent-father to move out of the home, (3) engaged with all required services, and (4) acknowledged the nonaccidental nature of Nellie's injuries. *In re J.M.*, 276 N.C. App. 291, 302 (2021). I agree with the lower appellate court's analysis of this issue and would affirm its decision on this basis. In my view, this is the appropriate result in light of the particular facts and circumstances of this case in which the trial court categorically found that reunification of the children with respondent-mother would be clearly unsuccessful or inconsistent with the health and safety of the juveniles when respondent-mother specifically refused to accept responsibility for the child Nellie's injuries, refused to affirmatively testify that respondent-father caused Nellie's injuries when respondent-mother represented that she did not know unequivocally that he did so, and declined to speculate as to the manner in which Nellie's injuries

were caused. I find it especially relevant that the remainder of the trial court's findings indicated that respondent-mother had taken definitive measures to mitigate risks to Nellie and Jon such as separating residences from respondent-father, whom the trial court found to be most likely responsible for the abuse. In the compelling face of these facts and circumstances, the majority's embrace of the trial court's leap to conclude that respondent-mother sought to protect respondent-father at the expense of the children's health and safety is unconvincing and unfortunate.

Further consternation arises regarding the majority's decision here upon its misguided determination that our decision in *In re D.W.P.*, 373 N.C. 327 (2020), requires us to reverse the outcome reached by the Court of Appeals. In *D.W.P.*, the respondent-mother not only failed to specify how her child David had received his suspected abusive injuries—including a femur fracture and multiple injuries to his ribs and tibia—but respondent-mother additionally provided multiple *false* explanations for the injuries, including representations that David's injuries had been caused by the family dog or by the child's biological father, with whom David had not been at or near the time of his last reported injury. *Id.* at 331–32. Respondent-mother also offered the rationale that the juvenile had simply "slept funny." *Id.* at 336. In addition to finding that respondent-mother had failed to gain sufficient insight into the cause of David's injuries to protect him from future harm, the trial court in *D.W.P.* also found that respondent-mother had (1) violated the conditions of her probation by failing to obtain a psychiatric evaluation; (2) resumed romantic

contact with, and provided a key to her home to, her fiancé, who was the person most likely responsible for inflicting injuries to her child and who had committed multiple acts of domestic violence against respondent-mother following their reunification; (3) withheld information regarding her subsequent marriage to another man; (4) evaded social workers; (5) discontinued therapy; and (6) ultimately failed to make adequate progress with her case plan. *Id.* at 332–37.

It is apparent how *D.W.P.* might guide this Court's analysis with respect to respondent-father in the instant case who, like the respondent-mother in *D.W.P.*, repeatedly denied the nonaccidental character of Nellie's injuries here and provided medically implausible, and even absurd, explanations as to the cause of the injuries. However, reunification is statutorily defined as the placement of a juvenile in the home of *either* parent from whom the child was removed and therefore the appropriateness of reunification with respondent-mother—who no longer shares a residence with respondent-father—ought to be considered separately in this matter. *See* N.C.G.S. § 7B-101(18c) (2021). Indeed, the relevance of *D.W.P.* with regard to respondent-*mother* is swallowed by the case's distinctions. Despite the fact that the trial court here found that respondent-mother had substantially complied with and completed her case plan, that she had engaged in and benefited from recommended services, and that she had acknowledged that the juvenile Nellie's injuries were nonaccidental in nature, the trial court determined that reunification efforts would be clearly unsuccessful or inconsistent with the health and safety of both Nellie and

Jon on the sole basis that respondent-mother could not affirmatively testify as to who had injured Nellie or the manner in which Nellie's injuries had occurred despite the trial court's knowledge of (1) the available evidence tending to implicate respondent-father, and (2) respondent-mother's repeated statements that she "didn't see [Nellie] get hurt" and therefore could not "fairly speculate what happened." The majority likewise adopts the trial court's approach in diminishing the significance of respondent-mother's statements in her favor on one hand, yet choosing on the other hand to derive heightened significance from respondent-mother's unhelpful statements. For example, both the majority and the trial court noted that respondent-mother desired to share custody of the children with respondent-father and that she trusted that respondent-father no longer posed a threat to them as the result of extensive domestic violence counseling, while both conveniently ignored respondent-mother's additional explanatory testimony that she would abide by any court order prohibiting respondent-father's contact with them.

Unlike in *D.W.P.* or other cases cited by petitioners including *In re Y.Y.E.T.*, 205 N.C. App. 120, *disc. rev. denied*, 364 N.C. 434 (2010), and *In re A.W.*, 377 N.C. 238 (2021), respondent-mother in this case (1) acknowledged that the juvenile Nellie had suffered a nonaccidental injury, (2) removed respondent-father from the home and did not resume a romantic relationship with him, and (3) engaged with and benefited from services provided to her through her case plan. Consequently, the only evidence from which the trial court concluded that reunification would be clearly

unsuccessful or inconsistent with the health and safety of Nellie and Jon was the fact that respondent-mother was not in position either to take personal responsibility for Nellie's injuries or to provide a specific explanation for how these injuries had been inflicted at the hands of respondent-father. As such, the majority's holding that the trial court's conclusion of law which eliminated reunification of the children with respondent-mother was supported by its findings, which were in turn supported by competent evidence, exceeds the parameters of our prior decisions by allowing the trial court here to foreclose reunification on the sole grounds that a parent may be unable to testify unequivocally as to facts about which the parent possessed no affirmative knowledge, even though the parent took definitive steps to substantially comply with the parent's prescribed case plan as well as to ensure the health and safety of the juveniles at issue.

For these reasons, I respectfully dissent in part.

Justice EARLS, dissenting.

At the heart of this case is the question of what law and justice require when an infant too young to identify her assailant is severely injured. No one suggests that the injuries inflicted on Nellie were anything other than non-accidental, repeated, and life-threatening. The real question is whose responsibility it is to determine the truth about who caused those injuries? Do our statutes and precedents permit a court to abdicate its fact-finding responsibility and punish both parents when the agency charged with protecting children fails to fully investigate the circumstances? More specifically, can a court eliminate the possibility that either parent will be reunified with their child under the child's permanency plan when both parents consistently maintain that they do not know who or what caused a child's injuries, the Department of Social Services (DSS) makes no effort to interview or report to the court regarding interviews of other potential witnesses, and both parents make substantial efforts to remedy the circumstances that are believed to have given rise to the child's injuries?

Based on the circumstances of this case, I would answer this question in the negative. I therefore dissent from the majority's decision affirming the trial court's elimination of reunification from the children's permanency plan. Though I would hold that the evidence was insufficient to support the trial court's conclusion as to both parents, I join in my dissenting colleague's analysis that the trial court made insufficient findings to support its decision denying respondent-mother the possibility

of reunification with her children. I concur with the majority's conclusion that respondent-parents did not properly preserve their constitutional argument for appellate review.

The record in this case is replete with evidence supporting the progress respondent-parents have made since DSS became involved with the family and the efforts both parents have made to regain custody of their children. After DSS took custody of Nellie in August 2018, both of her parents entered into detailed case plans with DSS. As part of respondent-mother's case plan, she was required to undergo a full psychological evaluation, complete "any recommended services," submit to random drug screenings, abstain from any drug use, complete a domestic violence assessment and follow related recommendations, obtain and maintain employment for at least six months, and engage in other parenting skills lessons.

After agreeing to this case plan and before the adjudication hearing, respondent-mother began participating in daily individual and group therapy sessions at an addiction treatment center,[1] completed a clinical assessment at the facility, and submitted to weekly drug testing. Throughout her participation with the DSS case plan, she remained in "compliance with all aspects" of the addiction program and passed all completed drug screenings, including hair follicle tests,

---

[1] Respondent-mother attended the group and individual therapy sessions daily until she completed the first phase of treatment and advanced to weekly, bi-weekly, and ultimately monthly sessions.

despite having previously suffered from an opioid addiction.[2] She completed a psychological evaluation and attended domestic violence and life skills classes once a week for four months. She did not miss a single class. She engaged in parenting-skills lessons, and DSS recognized that she gained insight as a result. Less than two weeks after entering the case plan with DSS, respondent-mother found a job and "consistently sent pictures of her work schedule and check stubs" to a DSS social worker to prove her continued employment.

Though he had one setback with respect to his case plan, respondent-father also substantially complied with the plan's requirements and objectives. The first psychological evaluation he completed revealed that he was "not completely forthcoming" and "demonstrated signs of externalizing blame onto others." Even so, respondent-father engaged in parenting lessons "and prepared a well-thought out report" on one assignment, which, according to DSS, demonstrated that he gained knowledge as a result. Respondent-father later completed a second psychological evaluation, which revealed that "he answered in a reasonably forthright manner and did not attempt to present an unrealistic or inaccurate impression." DSS reported that he was "very appropriate during his visits with his children[,] and he display[ed] appropriate parenting techniques and knowledge. He is attentive to each child's

---

[2] Respondent-mother also reported to a social worker that "she did have an opioid problem in the past and that she . . . stopped hanging out with friends from her past who she knew were involved in that lifestyle[ ] because she was done with that and focusing on what she needs to do to get her children back."

needs and shows affection for each child." (Italics omitted.)

Like respondent-mother, respondent-father completed a clinical assessment at an addiction rehabilitation facility. He began attending individual and family therapy sessions multiple times a month, and only needed to reschedule a single session. His therapist reported that respondent-father was "thoughtful with ideas and seem[ed] to be genuine in his efforts to work through [identified] issues." Furthermore, during a hearing at DSS, his counselor stated that respondent-father was "doing great, [which] is rare in his line of work in regards to attendance and engagement in therapy." Respondent-father passed all drug tests, including a hair follicle screen, with the exception of the first test he took on the same day that he entered into the case plan with DSS when he tested positive for marijuana use. Respondent-father completed a domestic violence tools assessment, attended domestic violence perpetrators classes, and maintained employment.

In addition to all of these efforts, respondent-parents ceased their romantic relationship and respondent-father moved into a different residence, as required by his case plan. In short, the parents did not merely "check [ ] the boxes," as the Guardian ad Litem suggests. To the contrary, they turned their entire lives around, doing everything in their power to regain custody of their children. But they have maintained that the one thing that is not in their power is the ability to determine the cause of Nellie's injuries. To the majority, this is all that matters.

Never mind that both parents have taken drastic steps to ensure that a similar incident does not happen again. For example, respondent-father explained that, after Nellie was hospitalized, respondent-mother "cut ties with [him] and wouldn't speak to [him]. She claimed if [he was] guilty . . . she didn't want [him] to be around." This means that even if respondent-mother or respondent-father is telling the truth—that they do not know how Nellie sustained her injuries—this parent can try anything and everything to regain custody of Nellie, but it will not be enough. There is nothing the parent can do to overcome his or her ignorance about the cause of Nellie's injuries unless the parent chooses to dishonestly blame the other.

This result risks perverse consequences. For example, consider that a child sustains injuries that a court determines could only have been caused by abuse. The parents were the child's sole care providers, and the court therefore determines that one of the parents must have caused the injuries. As here, both parents maintain that they do not know how their child was injured, but for purposes of this example, the mother is, in fact, responsible. If the mother eventually falsely accuses the father of causing the injuries, she at least has a chance of regaining custody over the child. But if the father truthfully maintains that he does not know how the child was injured, he will not have this opportunity. In this example, not only could the child be returned to the parent who caused the injuries, but an innocent parent who was unwilling to lie for his own benefit would suffer. This is not to say that a parent's refusal to accept fault or place blame for a child's injuries is irrelevant in determining whether it is

appropriate to maintain reunification as part of a child's permanency plan. For example, as the majority recognizes, in *In re D.W.P.*, 373 N.C. 327 (2020), this Court held that a mother's failure to acknowledge responsibility for her child's injury indicates a likelihood that injury will reoccur, despite the progress the mother made in her case plan.

In *In re D.W.P.*, the Court affirmed an order terminating a mother's parental rights after her child had been adjudged abused and neglected. 373 N.C. at 340. The mother's eleven-month-old son was treated for a broken femur and had numerous other fractures. *Id.* at 328. The mother and her fiancé were the child's only caretakers. *Id.* at 329. The trial court found that the mother failed to offer a medically feasible explanation for the injuries or to take responsibility for the role she and her fiancé had played in causing them, despite evidence that the injuries could only have been caused by the parents. *Id.* at 331. The trial court terminated the mother's parental rights, highlighting the mother's refusal to honestly report how her son's injuries occurred and the court's inability to create a plan to ensure that injuries would not occur in the future without knowing the cause of the injuries. *Id.* at 329.

In affirming the trial court's conclusion, this Court noted the troublesome nature of the mother's "continued failure to acknowledge the likely cause of [her son's] injuries," *id.* at 339, and her refusal "to make a realistic attempt to understand how [her son] was injured or to acknowledge how her relationships affect her children's wellbeing." *Id.* at 340. This Court added, "[w]ithout recognizing the cause of [the

child's] injuries, respondent-mother cannot prevent them from reoccurring." *Id.* at

338. Based on this similarity, the majority concludes that *In re D.W.P.* controls here,

requiring that the trial court's order on the children's permanency plan be affirmed.

But this similarity is not the only factor that influenced this Court's decision in *In re*

*D.W.P.*

Of note, the mother in *In re D.W.P.* discontinued therapy, failed to complete a

psychiatric evaluation, entered an *Alford* plea regarding her child's injuries, at which

point she offered a new theory for how her child was injured, and then violated the

terms of her probation, resumed a relationship with the child's father who was

potentially responsible for the child's injuries and in spite of the fact that there had

been multiple incidents of domestic violence between the parents, and concealed her

marriage to another man. *Id.* at 339. Indeed, this Court explained that the trial court

relied on

> past abuse and neglect; failure to provide a credible
> explanation for [the child]'s injuries; respondent-mother's
> discontinuance of therapy; respondent-mother's failure to
> complete a psychiatric evaluation; respondent-mother's
> violation of the conditions of her probation; the home
> environment of domestic violence; respondent-mother's
> concealment of her marriage from GCDHHS; and
> respondent-mother's refusal to provide an explanation for
> or accept responsibility for [the child]'s injuries.

*Id.* Here, by contrast, neither parent was criminally charged; they did not have

analogous case plan failures; and they did not resume a romantic relationship or live

together after Nellie was injured. Furthermore, the mother in *In re D.W.P.* offered

competing theories regarding how her child was injured raising concerns about her honesty, whereas the parents here have not engaged in such behavior. *See id.* at 334. Thus, unlike in *In re D.W.P.*, the trial court's conclusion was based almost entirely on respondent-parents' insistence that they do not know who or what caused Nellie's injuries.

In other words, in *In re D.W.P.*, *all* of the circumstances, including the mother's decision to "re-establish[ ] a relationship with" her boyfriend who she previously acknowledged could have been responsible for injuring her child, led this Court to conclude that the mother's inability "to recognize and break patterns of abuse that put her children at risk" prevented her from "mak[ing] a realistic attempt to understand how [her child] was injured or to acknowledge how her relationships affect her children's wellbeing." *Id.* at 340. The parents here have done just the opposite by both taking important remedial steps, such as attending relevant classes and terminating their relationship in recognition of the possibility that their continued co-habitation posed a risk to their children, and actually demonstrating growth as a result of these steps.

Contrary to the majority's conclusion that *In re D.W.P.* requires this Court to affirm the trial court's elimination of reunification from the permanency plan here, *In re D.W.P.* suggests that a holistic review of respondent-parents' subsequent conduct was required, rather than treating their lack of knowledge about the cause of Nellie's injuries as determinative. Specifically, the parents' relationship with their

children, their compliance with their case plans, and their demonstrated behavioral growth as a result of engaging with their case plan requirements are all relevant considerations in assessing whether reunification is appropriately included in their children's permanency plans.

The trial court's failure to conduct this thorough analysis and its improper focus on a single fact in the record in contravention of *In re D.W.P.* are demonstrated by its finding that "[w]ithout . . . acknowledgment" of the source of Nellie's injuries, there was "*no* evidence that either parent will protect their children over protecting one another." (Emphasis added.) As the discussion above demonstrates, however, the idea that there is a complete dearth of evidence supporting that respondent-parents will protect their children over each other is patently inaccurate. This finding can therefore only follow from the fact that respondent-parents have continued to maintain that they do not know who injured Nellie. In light of all of the evidence in the record, this singular fact is insufficient to support the trial court's factual finding, meaning the finding is not supported by competent evidence in the record. In holding to the contrary, the majority allows trial courts to abandon the holistic approach of *In re D.W.P.* and instead focus exclusively on one factor that may say very little about parents' ability to protect the well-being of their children or the children's best interests.

In addition to the requirement that the trial court's factual findings be supported by competent evidence, the trial court's findings of fact must also support

its conclusions of law. *See, e.g.*, *In re H.A.J.*, 377 N.C. 43, 49, 52 (2021). Here, the trial court concluded that "[f]urther efforts to reunify the children with either parent would clearly be unsuccessful and inconsistent with the children's health and safety." This conclusion is in turn based on the finding that, without respondent-parents acknowledging the source of Nellie's injuries, there is "no evidence that either parent will protect their children over protecting one another, and therefore the risk to these children of abuse and neglect remains high." The trial court, unsatisfied that one of the parents had not blamed the other or personally accepted responsibility, determined that both parents were incapable of caring for Nellie. Based on the discussion above, this extreme conclusion is not supported by the trial court's findings of fact.

Nonetheless, the trial court could have made certain findings that would support this legal conclusion. Specifically, the trial court could have made specific findings regarding which parent was most likely responsible for Nellie's injuries and whether the other parent was telling the truth about not knowing how she was injured. It is possible that the trial court did not believe there was enough evidence in the record to support such findings, which highlights the reality that DSS's investigation into respondent-parents was insufficient.

Evidence that could have supported such factual findings that would have in turn supported the trial court's legal conclusion (or required a different one) includes interviews with or testimony from individuals who know respondent-parents and

were familiar with the dynamics in their home at the time Nellie was injured, such as respondent-mother's older children who likely had unique and intimate insight into respondent-parents' treatment of Nellie and her brother. As mentioned, this obvious source of evidence could have allowed the trial court to find as fact which parent was responsible for abusing Nellie. Furthermore, such evidence could shed additional light on whether the other parent was being truthful about not knowing the cause of Nellie's injuries. But because there was insufficient evidence in the record from which the trial court could make these specific factual findings, it effectively held both parents responsible, despite the possibility that this blame was misplaced as to one of them.

These untapped avenues of evidence demonstrate that more could have been done in this case to either support the trial court's legal conclusions or to require different conclusions that would have preserved reunification as a possibility for at least one of the parents. Without more specific findings with respect to respondent-parents' responsibility, however, the trial court's findings do not support its legal conclusion that "[f]urther efforts to reunify the children with either parent would clearly be unsuccessful and inconsistent with the children's health and safety." Accordingly, the trial court's decision to eliminate reunification from respondent-parents' permanency plans was an abuse of discretion.

Finally, it is important to recognize that the options available to the trial court here were not limited to the extremes of eliminating reunification entirely from the

permanency plan or immediately returning custody of the children to the parents and terminating DSS involvement. Rather, the parents simply requested that reunification remain part of the permanency plan.[3] The trial court was free to fashion a plan that maintained the status quo and DSS's involvement with the family. This unobtrusive approach was warranted given the significant efforts that respondent-parents made to correct the circumstances that resulted in Nellie's injuries.

It is well established that "a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). By taking a myopic view of the considerations that are relevant in determining whether reunification is appropriate under the circumstances presented in this case, the majority ignores this powerful countervailing interest. Further, the majority implicitly holds that maintaining honesty may be treated as deception and parents' diligent engagement with their case plans may be meaningless if they are unable to prescribe the cause of a child's injuries or refuse to place improper blame on another individual. Because the Court's holding

---

[3] Similarly, prior to the February 2020 permanency planning hearing, the GAL recommended that "the court order a primary plan be one of adoption, with a secondary plan of reunification, while the cause of [Nellie's] injuries remains unexplained." DSS recommended a primary plan of reunification and a secondary plan of adoption. Thus, neither of the appealing parties sought elimination of reunification from the permanency plan as a whole.

represents a woefully inadequate analysis of the circumstances that bear on the children's permanency plan, I respectfully dissent from the majority's conclusion that the trial court's elimination of reunification from the permanency plan was supported by competent evidence in the record.