614 S.E.2d 489 (2005)
359 N.C. 539
In the Matter of R.T.W.
No. 417PA04.
Supreme Court of North Carolina.
July 1, 2005.
Northen Blue, LLP, by Carol J. Holcomb and Samantha H. Cabe, Chapel Hill, for petitioner-appellant Orange County Department of Social Services.
Terry F. Rose, Smithfield, for respondent-appellee.
*490 NEWBY, Justice.
The issue is whether a trial court retains jurisdiction to enter an order terminating parental rights while a custody order in the same case is pending appellate review. We conclude it does and reverse the Court of Appeals.

I. BACKGROUND
In December of 2000, Child Protective Services (CPS) received a report alleging respondent-then age fourteen-had been sexually abused by her twenty-one-year-old half-brother while living with her mother in Hillsborough. An investigation revealed respondent was pregnant with her half-brother's child. Respondent's half-brother was eventually imprisoned for statutory rape.
Respondent gave birth to her son, R.T.W., on 4 May 2001. Thereafter, CPS referred fresh accusations of neglect to petitioner Orange County Department of Social Services (DSS). These allegations raised concerns about the family's housing (a roach-infested residence with lead paint peeling off the walls that lacked electricity and running water and was later condemned), excessive alcohol consumption by respondent's mother, respondent's failure to bond with R.T.W., and inadequate adult supervision of both respondent and her newborn son.
In response to these allegations, DSS obtained a court order on 23 August 2001 granting it custody of fifteen-year-old respondent and three-and-one-half-month-old R.T.W. Respondent was sent to a residential group home for adolescents, and R.T.W. was placed in foster care. The next day, DSS filed a juvenile petition alleging R.T.W. was a neglected and dependent juvenile. At a 4 October 2001 adjudicatory hearing, the trial court determined R.T.W. to be a dependent juvenile. See N.C.G.S. § 7B-101 (2003).
One month later, on 1 November 2001, the court held a combined custody review/permanency planning hearing.[1] It entered an order (hereinafter "custody review order") directing that R.T.W. remain in the custody of DSS and that efforts to reunify respondent and R.T.W. cease. The custody review order also set adoption as the permanent plan for R.T.W. and instructed DSS to file a petition or motion in the cause within sixty days to terminate respondent's parental rights. Respondent appealed the order.
While this appeal was pending, on 20 December 2001, as instructed by the trial court, DSS filed a motion to terminate respondent's parental rights. The trial court held hearings on the matter on four dates in 2002 and 2003. On 29 January 2003, the court entered a termination order. In its findings of fact, *491 the court cited, inter alia, respondent's need for years of therapy due to the abuse and neglect she had suffered and the risk of abuse and neglect to R.T.W. if returned to her care. Per N.C.G.S. § 7B-1111, the court concluded that respondent was incapable of properly caring for and supervising R.T.W. and that those circumstances would likely continue for the foreseeable future. Respondent also appealed the termination order.
Soon after R.T.W.'s second birthday, an unpublished Court of Appeals opinion filed on 20 May 2003 remanded the custody review order to the trial court for additional findings of fact. In re R.T.W., 157 N.C. 716, 580 S.E.2d 98, 2003 WL 21153404 (May 20, 2003) (No. COA03-728). Although the trial court entered a revised order with additional findings on 25 July 2003, it opined that its termination order had rendered this aspect of the matter moot.[2]
Nearly one year later, on 6 July 2004, the Court of Appeals vacated the termination order, ruling the trial court lacked jurisdiction to terminate parental rights during the pendency of respondent's appeal of the custody review order. In re R.T.W., 165 N.C.App. 274, 600 S.E.2d 274, 2004 WL 1497710 (July 6, 2004) (No. COA03-728). Following In re Hopkins, 163 N.C.App. 38, 592 S.E.2d 22 (2004), it based its holding on N.C.G.S. § 7B-1003, which permits trial courts to enter "`temporary order[s] affecting ... custody or placement'" while a custody order is pending appeal. R.T.W., 2004 WL 1497710 at *1 (quoting N.C.G.S. § 7B-1003) (emphasis added). The Court of Appeals found the statute's use of the term "temporary" to be dispositive: "[A termination order] `is ... a permanent rather than a temporary order affecting ... custody or placement[.]' Therefore, the trial court does not have jurisdiction to terminate parental rights while a[n] appeal from an earlier order is pending." Id. (alterations in original).
The court mentioned, but refused to follow, In re Stratton, 159 N.C.App. 461, 583 S.E.2d 323 (2003), which held the entry of a termination order rendered a father's pending appeal of an earlier custody order moot.[3]Hopkins and Stratton have produced two conflicting lines of cases. See In re V.L.B., 164 N.C.App. 743, 745, 596 S.E.2d 896, 897 (2004) (following Stratton); In re J.C.S., 164 N.C.App. 96, 101-03, 595 S.E.2d 155, 158-59 (2004) (distinguishing Hopkins and Stratton but following Hopkins); In re N.B., 163 N.C.App. 182, 183-84, 592 S.E.2d 597, 598 (2004) (following Stratton). Although the Court of Appeals has attempted to reconcile these cases, it recently conceded they are, in fact, "irreconcilable." V.L.B., 164 N.C.App. at 746, 596 S.E.2d at 897.
We allowed DSS's petition for discretionary review to resolve the conflict in our lower court's case law. As neither party has any constitutional claim properly before this Court, we decide this case on purely statutory grounds. We hold the pending appeal of a custody order does not deprive a trial court of jurisdiction over termination proceedings. As explained below, our holding rests on the legislative intent evident in relevant portions of North Carolina's Juvenile Code, Subchapter I (Abuse, Neglect, Dependency). We affirm Stratton as correctly implementing the legislature's intent, and we specifically overrule Hopkins and J.C.S. A summary of parental rights and a review of the relevant aspects of Subchapter I are foundational to our analysis.

II. PARENTAL RIGHTS
Parents have a fundamental right to the custody, care, and control of their children. David N. v. Jason N., 359 N.C. 303, *492 305, 608 S.E.2d 751, 752-53 (2005) (citing Petersen v. Rogers, 337 N.C. 397, 400, 445 S.E.2d 901, 903 (1994)); In re Montgomery, 311 N.C. 101, 106, 316 S.E.2d 246, 250 (1984) (citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)); see also N.C.G.S. § 7B-3400 (2003) (confirming children under 18 are "subject to the supervision and control of [their] parents"). This right enjoys constitutional protection. See, e.g., David N., 359 N.C. at 305, 608 S.E.2d at 752-53. However, it is not absolute. Id.
The law has long viewed parental rights and parental responsibilities as two sides of the same coin. 1 William Blackstone, Commentaries * *434-40 (observing a father's authority over his children at common law was derived from his duty to maintain, protect, and educate them). In other words, one who refuses to behave like a parent risks losing the rights of a parent. Hence it is possible for mothers and fathers to forfeit parental rights through unfitness or conduct inconsistent with their constitutionally protected status. David N., 359 N.C. at 307, 608 S.E.2d at 753-54 (holding parents may abandon their status through abandonment, abuse, or neglect). When this occurs, the state's interest in the welfare of the child may warrant removing the child from the parent's custody and even-on rare occasions-terminating parental rights. See Montgomery, 311 N.C. 101, 316 S.E.2d 246.

III. SUBCHAPTER I OF THE JUVENILE CODE
The principles articulated in Section II permeate Subchapter I of the Juvenile Code, which reflects the need both to respect parental rights and to protect children from unfit, abusive, or neglectful parents. See N.C.G.S. §§ 7B-100 to -1414 (2003). As previously noted, our resolution of this case depends upon the legislative intent evident in the subchapter. We concentrate on Article 1, certain sections of Articles 2 through 10, and Article 11. Article 1 contains a declaration of legislative intent applicable to all of Subchapter I. Id. § 7B-100. Articles 2 through 10 address child custody and permanency planning matters. Id. §§ 7B-200 to -1004. Article 11 establishes the rules governing the termination of parental rights. Id. §§ 7B-1100 to -1113.

A. ARTICLE 1-LEGISLATIVE INTENT
Article 1 of Subchapter I directs us to construe the rest of the subchapter in a manner that accomplishes the following purposes and policies:
(1) To provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents;
(2) To develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family[;]
(3) To provide for services for the protection of juveniles by means that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence; []
(4) To provide standards for the removal, when necessary, of juveniles from their homes and for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents[; and]
(5) To provide standards, consistent with the Adoption and Safe Families Act of 1997, P.L. 105-89,[4] for ensuring that the best interests of the juvenile are of paramount consideration by the court and that when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time.
N.C.G.S. § 7B-100.
Section 7B-100 of Article 1 underscores the General Assembly's awareness of the potential tension between parental rights and child welfare. It provides for removing children *493 from their homes, but only "when necessary" and consistent with fairness, equity, and "the constitutional rights of juveniles and parents." Id. Our legislature values "family autonomy" and prefers the familial unit as usually being the best means of satisfying a child's need for "safety, continuity, and permanence." Id. Even when removal is temporarily necessary, N.C.G.S. § 7B-100 urges returning children to their parents unless doing so would not be in the children's "best interest." Id.
This last point is crucial. For all the statute's concern with preserving families, subdivision (5) of N.C.G.S. § 7B-100 clearly makes the "best interests of the juvenile" the courts'"paramount consideration" when hearing cases arising under Subchapter I. Moreover, when reunification is against the child's best interest, subdivision (5) favors placing the child "in a safe, permanent home within a reasonable amount of time."
Enacted in 2003, subdivision (5) is the most recent amendment to N.C.G.S. § 7B-100. We presume the General Assembly added it either to change the substance of the law or to clarify its meaning. See Childers v. Parker's Inc., 274 N.C. 256, 260, 162 S.E.2d 481, 483 (1968). Since nothing in subdivision (5) appears inconsistent with the rest of the statute, we divine no intent to alter the substance of the law. Rather, we believe the legislature intended to emphasize that (1) when a parent has forfeited his constitutionally protected status, the child's best interest should prevail in any proceeding under Subchapter I and (2) interminable custody battles do not serve the child's best interest. This expression of legislative priorities informs our analysis.

B. ARTICLES 2 THROUGH 10-CHILD CUSTODY PROCEEDINGS
The General Assembly's explicit desire to preserve parent-child relationships and protect children explains the fluidity of child custody proceedings under Articles 2 through 10 of Subchapter I. These proceedings afford the trial court multiple opportunities to consider and reconsider whether a child is abused, neglected, or dependent, and if so, who should have custody. They also give parents time to correct the deficiencies that led to the child's removal. Essentially, there is no such thing as a "final" custody order, only the most recent one.
Custody proceedings are initially a two-stage process.[5] At the adjudicatory hearing, the trial court makes a threshold determination regarding the state's right to intervene. DSS must prove abuse, neglect, or dependency by clear and convincing evidence, a higher evidentiary standard than that typically applied in civil actions.[6]Id. § 7B-805. If the evidence substantiates the allegations, the court enters a written order reflecting its findings and proceeds to stage two, the dispositional hearing. Id. § 7B-807. Otherwise, the court dismisses DSS's petition with prejudice and, if the child is in DSS's custody, releases him to his parent. Id.
Should a dispositional hearing be necessary, the court receives evidence and makes a discretionary decision concerning custody.[7] N.C.G.S. § 7B-901. Specifically, it enters a written order directing one of the dispositional alternatives available under N.C.G.S. § 7B-903. Id. §§ 7B-901, -903 (describing dispositional alternatives that include dismissing the case or granting custody to a parent, relative, or DSS). This decision and any subsequent custody determinations are based on the child's best interest. Price v. Howard, 346 N.C. 68, 79, 484 S.E.2d 528, 535 (1997) ("Where [a parent forfeits his constitutionally protected status], custody should be determined by the `best interest of the child' test mandated by statute.").
*494 A dispositional hearing is hardly the decisive event its name implies. When, as here, the dispositional order removes custody from a parent, the court holds a custody review hearing within ninety days of the dispositional hearing and again within six months.[8]Id. § 7B-906(a). Relying on evidence adduced at these hearings, the court enters written custody review orders either continuing the current placement or modifying custodial arrangements. Id. § 7B-906(c), (d).
The permanency planning process in Article 9 is meant to bring about a definitive placement plan for the abused, neglected, or dependent child. Within twelve months of its initial custody order removing a child from his parent, the court must conduct a permanency planning hearing to "develop a plan to achieve a safe, permanent home for the juvenile within a reasonable period of time." Id. § 7B-907(a). The permanent plan may include, inter alia, returning the child to his parent, legal guardianship, or adoption. See N.C.G.S. § 7B-907. The court enters a written order memorializing the permanent plan and continuing or modifying custodial arrangements accordingly. Id. § 7B-907(c). Even the "permanent plan" is not immutable, however. Follow-up hearings every six months enable the court to review progress and, if necessary, formulate a new permanent plan. N.C.G.S. § 7B-907(a).
Nowhere is the flexibility of the custody process more pronounced than in Article 10. In addition to the aforementioned mandatory review hearings, this article endows the trial court with continuing jurisdiction to modify or vacate custody orders "in light of changes in circumstances or the needs of the juvenile." Id. § 7B-1000(a).
The interlocutory quality of custody orders would normally preclude their immediate appeal except in conformity with N.C.G.S. § 1-277. See Travco Hotels, Inc. v. Piedmont Natural Gas Co., 332 N.C. 288, 291, 420 S.E.2d 426, 428 (1992). Because of the importance of the interests involved in custody proceedings, however, Article 10 makes many custody orders subject to immediate appeal. N.C.G.S. § 7B-1001. Furthermore, although N.C.G.S. § 1-294 ordinarily divests a trial court of jurisdiction over cases pending appeal, section 7B-1003 of Article 10 allows trial courts to enter "temporary order[s] affecting ... custody or placement" while a custody order awaits appellate review. Id. § 7B-1003.[9]
Obviously, this statutory scheme could result in protracted custody proceedings that leave the legal relationship between parent and child unresolved and the child in legal limbo. Such an outcome would thwart the legislature's wish that children be placed "in ... safe, permanent home[s] within a reasonable amount of time." Id. § 7B-100(5). In order to avoid this, Subchapter I mandates that DSS initiate proceedings to terminate parental rights at certain stages in the custody process. Id. § 7B-907(d), (e). Of particular relevance is N.C.G.S. § 7B-907(e), which directs DSS to file a termination petition or motion within sixty days of the permanency planning hearing if termination is necessary to perfect the permanent plan (for example, when adoption is the plan). Additionally, N.C.G.S. § 7B-907(d) requires DSS to request termination of parental rights whenever a child in its custody has been placed outside the home for twelve of the twenty-two most recent months. This leads us to a brief discussion of the grounds and procedures for terminating parental rights found in Article 11 of Subchapter I.

C. ARTICLE 11-TERMINATION OF PARENTAL RIGHTS
Unlike the loss of custody possible under Articles 2-10, the dissolution of parental rights under Article 11 is decisive. Termination orders "completely and permanently terminate[] all rights and obligations of the parent to the juvenile and the juvenile to the parent arising from the parental relationship." N.C.G.S. § 7B-1112.
*495 Aside from its effect, Article 11 differs from Articles 2 through 10 in other important respects. It contains its own provisions regarding legislative intent, jurisdiction, standing, notice, hearing, and appeal. Id. §§ 7B-1100 to -1113. The article includes a host of procedural requirements that, "consistent with due process, ... protect the various interests of the parties involved." Montgomery, 311 N.C. at 108, 316 S.E.2d at 251. These provisions encompass notice requirements and the right to counsel, even legal representation at the state's expense for indigent parents. N.C.G.S. §§ 7B-1106.1,-1109(b).
Section 7B-1111 of Article 11 sets forth nine grounds for terminating parental rights, the sixth of which applies here, namely, a parent's inability to provide for "the proper care and supervision" of a child and the "reasonable probability that such incapability will continue for the foreseeable future." Id. § 7B-1111(a)(6). Abuse or neglect constitutes merely the first ground for termination. Id. § 7B-1111(a)(1).
As described, Subchapter I requires DSS to seek termination of parental rights in certain instances. Notwithstanding these, DSS has standing to file a petition or motion in the cause to terminate parental rights whenever it has custody of a child from a court order or surrender for adoption. Id. § 7B-1103. Among others, judicially appointed guardians and persons who have filed for adoption also have standing to seek termination. Id.
Termination proceedings have adjudicatory and dispositional phases analogous to, but independent of, those in custody proceedings.[10]See N.C.G.S. §§ 7B-1109 to -1110. During the adjudicatory phase, the court takes evidence, makes findings of fact, and determines the existence or nonexistence of grounds for termination. Id. § 7B-1109(e). The burden of proof is on DSS in this phase, and the court's findings must be "based on clear, cogent, and convincing evidence."[11]Id. § 7B-1109(f). Assuming a judicial finding that a ground for termination exists, the trial court's decision in the dispositional phase is discretionary. See id. § 7B-1110. The court need not order termination if it further determines "the best interests of the juvenile require that the parental rights of the parent not be terminated." Id. Parties may appeal a termination order pursuant to N.C.G.S. § 7B-1113.
Proceedings to terminate parental rights are considerably more streamlined than custody proceedings. Once a petition or motion to terminate parental rights has been filed, the court must hold a termination hearing within ninety days absent good cause shown. N.C.G.S. § 7B-1109. Should the court order termination, the order must be written, signed, and entered within thirty days of the hearing. Id. § 7B-1110. Although trial courts possess some authority to modify termination orders that have been appealed and affirmed, there is no requirement under Article 11 that the courts periodically review them. Id. § 7B-1113. Thus, unencumbered by appeals of the sort at issue here, termination proceedings offer speed and finality not found in custody proceedings.

IV. ANALYSIS
The question presented is whether a trial court has jurisdiction to terminate parental rights while a custody order in the same case is pending appeal. Following Hopkins, 163 N.C.App. 38, 592 S.E.2d 22, the Court of Appeals held that N.C.G.S. § 7B-1003 divested the trial court of jurisdiction to enter a termination order while respondent's appeal of a prior custody review order was pending. We disagree.
Our resolution of this case turns on legislative intent. In re Estate of Lunsford, 359 N.C. 382, 392, 610 S.E.2d 366, 373 (2005)("The primary rule of statutory construction is to effectuate the intent of the legislature."); State v. Roache, 358 N.C. 243, 273, 595 S.E.2d 381, 402 (2004)("In interpreting a statute, this Court must first discern *496 the legislative intent in passing the statute."). Fortunately, the North Carolina General Assembly took pains to communicate its intent in matters involving the removal of children from their parents and the termination of parental rights. We have previously observed that N.C.G.S. § 7B-100 stresses the paramount importance of the child's best interest and the need to place children in safe, permanent homes within a reasonable time. Whenever possible, we will construe the provisions in Subchapter I to effectuate this intent. See Montgomery, 311 N.C. at 109, 316 S.E.2d at 251 ("[T]he fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody [is] that the best interest of the child is the polar star.")
We first examine N.C.G.S. § 7B-1003. In both Hopkins and the instant case, the Court of Appeals assumed this statute applies to termination proceedings. The court interpreted the statute as limiting a trial court's "authority over a juvenile." In re R.T.W., 165 N.C.App. 274, 600 S.E.2d 521, 2004 WL 1497710 at *1 (July 6, 2004) (No. COA03-728). It reasoned that, since a termination order is final rather than temporary, N.C.G.S. § 7B-1003 prohibits the entry of one during the pendency of a custody order appeal. Id.
After careful review, we believe our lower court misidentified the relevant law. Section 7B-1003 reads in pertinent part as follows:
Pending disposition of an appeal, the return of the juvenile to the custody of the parent or guardian of the juvenile, with or without conditions, may issue unless the court orders otherwise.... For compelling reasons which must be stated in writing, the court may enter a temporary order affecting the custody or placement of the juvenile as the court finds to be in the best interests of the juvenile or the State.

N.C.G.S. § 7B-1003 (emphasis added).
On its face, N.C.G.S. § 7B-1003 nowhere references orders terminating parental rights. In concluding the General Assembly did not intend for it to prohibit termination proceedings under Article 11, we rely upon the legislative purpose behind this particular statute.
The Hopkins court wrongly viewed N.C.G.S. § 7B-1003 as a limitation on the authority of trial courts to terminate parental rights; in fact, the statute represents an expansion of their jurisdiction in child custody proceedings. As a general rule, N.C.G.S. § 1-294[12] stays all further proceedings at the trial level once an appeal is perfected except on matters "not affected by the judgment appealed from." This is true unless a specific statute addresses the matter in question. See In re Huber, 57 N.C.App. 453, 459, 291 S.E.2d 916, 920, disc. rev. denied, 306 N.C. 557, 294 S.E.2d 223 (1982). Applied to appeals in child custody cases, however, N.C.G.S. § 1-294 would leave trial courts powerless to modify custodial arrangements in response to changed circumstances and the child's best interests. Section 7B-1003 avoids this by permitting trial courts to enter temporary orders affecting custody or placement. Huber, 57 N.C.App. at 459, 291 S.E.2d at 920 ("Without authority of the district court to [enter temporary custody orders during a] pending appeal, a recalcitrant party could frustrate the efforts of the court to provide for [the child's] best interests by simply entering notice of appeal.") These orders are necessarily "temporary" because the underlying custody orders are awaiting appellate review. Rightly understood, then, N.C.G.S. § 7B-1003 conserves the ability of trial courts to protect children during the pendency of custody order appeals. The statute is silent on proceedings to terminate parental rights.
Given that N.C.G.S. § 7B-1003 does not address termination proceedings, the question becomes whether the trial court lost jurisdiction under N.C.G.S. § 1-294 to terminate respondent's parental rights. Respondent argues that it did because DSS's standing to request termination was "affected by" *497 the validity of custody review order on appeal. This argument is unpersuasive.
We have already mentioned Article 11's unique jurisdictional and standing provisions. Section 7B-1101 confers "exclusive original jurisdiction" on district courts "to hear and determine" petitions or motions to terminate parental rights "relating to ... any juvenile ... in the legal or actual custody of [DSS]." Section 7B-1103 endows DSS with standing when it "has been given [custody of a child] by a court of competent jurisdiction." It is apparent to us the General Assembly intended these provisions to govern when trial courts may conduct proceedings to terminate parental rights. See In re Peirce, 53 N.C.App. 373, 380, 281 S.E.2d 198, 202-03 (1981) (opining the comprehensiveness of former Article 24B-predecessor to Article 11-betokened the legislature's intent that it "exclusively control the procedure to be followed in the termination of parental rights"). In the instant case, DSS had custody of R.T.W. pursuant to a court order; it therefore had standing under N.C.G.S. § 7B-1103 to initiate termination proceedings, and the trial court had jurisdiction under N.C.G.S. § 7B-1101 over those proceedings. Accepting respondent's argument would necessitate reading into Article 11 a requirement that DSS's custody be legally unassailable. The legislature chose not to impose such a requirement, however, and we decline to second-guess its judgment.
Neither respondent's argument nor Hopkins can be squared with the statutory timeline for proceedings to terminate parental rights. We have explained that, when a termination order is necessary to perfect the permanent plan, N.C.G.S. § 7B-907(e) obliges DSS to file a termination petition or motion within sixty calendar days of the permanency planning hearing. Moreover, regardless of the permanent plan, N.C.G.S. 7B-907(d) directs DSS to seek termination as soon as a child has been placed outside the home for twelve of the most recent twenty-two months. Once DSS initiates termination proceedings, Article 11 requires the trial court to hold a termination hearing within ninety days absent good cause shown and to write, sign, and enter any termination order not later than thirty days after the hearing. Id. §§ 7B-1109 to -1110. By depriving the trial court of jurisdiction over termination proceedings, Hopkins would effectively preclude compliance with this timeline whenever a custody order is appealed. In so doing, it would frustrate the legislature's efforts to bring closure to custody disputes arising under Subchapter I.
The potential effect of Hopkins goes far beyond mere delay. Taken to an extreme, Hopkins reduces Article 11 to a nullity.[13] As summarized above, the custody process established in Subchapter I involves multiple custody orders and opportunities to appeal those orders. Were we to countenance the Hopkins construction of N.C.G.S. § 7B-1003, parents could indefinitely evade termination proceedings with repeated appeals of custody orders. In such situations, children would be entirely denied a stable home life, a result completely repugnant to their best interests and consequently to N.C.G.S. § 7B-100. The instant case illustrates the real-world effect of Hopkins: R.T.W., three-and-one-half months old when first placed in foster care, is now over four years old.
We hasten to add that our holding does not prejudice the rights of parents. Trial courts may order the termination of parental rights only after conducting termination proceedings with adjudicatory and dispositional phases separate from those held during custody proceedings. Each termination order relies upon an independent finding that clear, cogent, and convincing evidence supports at least one of the grounds for termination under N.C.G.S. § 7B-1111. Section 7B-1113 affords parents the opportunity to challenge termination orders on appeal. Simply put, a termination order rests on its own merits.
*498 It is true that trial courts are permitted to consider previous adjudications of neglect when determining whether grounds for termination exist. In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). In Ballard, however, we held that a termination order may not be based solely on a prior adjudication of neglect. Id. The trial court "must also consider any evidence of changed conditions" since then. Id. (emphasis added). Despite any prior adjudication, the dispositive factor is "the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding." Id. Of course, a party who believes the trial court improperly relied on a custody order during termination proceedings is free to raise the issue in an appeal of the order terminating parental rights. See N.C.G.S. § 7B-1113.
In sum, proceedings to remove children and terminate parental rights under Subchapter I of our Juvenile Code involve interests vital to our society. Parents' fundamental right to control their children at some point gives way to the state's interest in the welfare of the child. In Subchapter I of our Juvenile Code, the General Assembly has established procedures to safeguard parental rights while simultaneously providing for the removal of children and even the termination of parental rights. The Hopkins approach upsets the balance struck by our legislature, and we reject it. See Henry v. Edmisten, 315 N.C. 474, 491, 340 S.E.2d 720, 731 (1986) ("The role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests. The role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials.").

V. DISPOSITION
For the foregoing reasons, we hold a trial court retains jurisdiction to terminate parental rights during the pendency of a custody order appeal in the same case. The termination order necessarily renders the pending appeal moot. In the case sub judice, the trial court acted within its authority when it entered an order terminating respondent's parental rights. The decision of the Court of Appeals is reversed and the matter remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
NOTES
[1] A trial court may combine the custody review hearing required by N.C.G.S. § 7B-906 with the permanency planning hearing required by N.C.G.S. § 7B-907 "if appropriate." N.C.G.S. § 7B-907(a) (2003).
[2] Respondent appealed this second custody review order on 25 July 2003. On 2 February 2004, the Court of Appeals dismissed this appeal. Respondent subsequently filed a petition for writ of certiorari, which this Court allowed on 6 May 2004. Our decision in the instant case renders that petition moot, and we dismiss it in a separate order.
[3] The Hopkins panel should have followed Stratton, which is the older of the two cases. In re Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 36-37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court."). Had it done so, we would not have two conflicting lines of cases to resolve.
[4] The Adoption and Safe Families Act contains assorted permanency planning requirements designed to reduce the time children spend in foster care. See 42 U.S.C. § 671-75 (2000).
[5] Child custody proceedings often begin, as they did here, with a DSS request for an emergency custody order based on the extreme circumstances detailed in N.C.G.S. § 7B-503. Even absent such a request, DSS may file a juvenile petition in district court alleging abuse, neglect, or dependency within the meaning of N.C.G.S. § 7B-101. See N.C.G.S. §§ 7B-400 to -402.
[6] Most civil actions are decided using a "preponderance of the evidence" standard. Montgomery, 311 N.C. at 109-10, 316 S.E.2d at 252. Having a higher standard in custody cases protects the parent-child relationship from undue interruption.
[7] The dispositional hearing may be informal. N.C.G.S. § 7B-901.
[8] When the criteria in N.C.G.S. § 7B-906(b) are met, the court may waive custody review hearings in favor of written reports or hold the hearings less frequently than every six months.
[9] This, of course, is the provision relied on by the Court of Appeals in Hopkins and the instant case.
[10] While distinct, both phases may occur at the same hearing. See In re White, 81 N.C.App. 82, 85, 344 S.E.2d 36, 38 cert. denied, 318 N.C. 283, 347 S.E.2d 470 (1986).
[11] "Clear and convincing" and "clear, cogent, and convincing" are equivalent evidentiary standards. Montgomery, 311 N.C. at 109, 316 S.E.2d at 252 (1984).
[12] N.C.G.S. § 1-294 provides: "When an appeal is perfected as provided by this Article it stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein; but the court below may proceed upon any other matter included in the action and not affected by the judgment appealed from."
[13] The dissent in V.L.B. acknowledged: "Hopkins allows a respondent to continuously appeal permanency planning orders every six months, thereby burdening [the Court of Appeals] with unnecessary appeals and suspending the disposition of custody suits." V.L.B., 164 N.C.App. at 748, 596 S.E.2d at 899 (Timmons-Goodson, J., dissenting). "[S]uspending the disposition of custody suits" is precisely one of the evils the legislature has expressed its desire to avoid.