IN THE SUPREME COURT OF NORTH CAROLINA

No. 142A23

Filed 13 December 2024

IN THE MATTER OF: K.C.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 288 N.C. App. 543 (2023), vacating and remanding an order entered on 8 February 2022 by Judge Doretta L. Walker in District Court, Durham County. On 1 September 2023, the Supreme Court allowed petitioner's petition for discretionary review as to additional issues. Heard in the Supreme Court on 20 February 2024.

*Patrick A. Kuchyt for petitioner-appellant Durham County Department of Social Services.*

*Alston & Bird LLP, by Kelsey L. Kingsbery for appellee Guardian ad Litem.*

*Richard Croutharmel for respondent-appellee father.*

DIETZ, Justice.

Parents have a constitutional right to care for their children and guide their upbringing. Sadly, there are times when the State's own compelling interest in protecting children forces the State to step in and remove children from their parents.

In our juvenile system, a complex series of statutes governs the removal of children from their parents' care. *See* N.C.G.S. § 7B-100 *et seq*. These statutes, known as the Juvenile Code, are designed to ensure that the rights of both parents and

children are protected, while also prioritizing the children's need for a safe, permanent home during childhood.

In most juvenile cases, these statutory safeguards also ensure that the State's actions do not violate the parents' constitutional rights. But there can be rare cases in which—although the provisions of the Juvenile Code are satisfied—removing a child from the parent's care would violate the parent's constitutionally protected status. Put another way, there can be rare cases in which, as applied to a particular parent, the Juvenile Code is unconstitutional because its protections of a parent's interests are not strong enough. *See generally In re B.R.W.*, 381 N.C. 61, 77 (2022).

Importantly, this constitutional claim must be preserved for appellate review like any other. *See In re J.N.*, 381 N.C. 131, 133 (2022). To do so, a parent must inform the trial court and the opposing parties that the parent is asserting a challenge *on constitutional grounds* and articulate the basis for that constitutional claim. *Id.* at 133–34. If the parent fails to do so, the claim cannot be reviewed on appeal.

This waiver principle applies even if the trial court addresses the issue on its own initiative in its order. In that circumstance, waiver is compelled not only by the principles articulated in cases such as *In re J.N.*, but also from the doctrinal requirement that trial courts base their rulings on the evidence in the record. If a parent does not raise this constitutional claim, the opposing parties will not have notice that they must present evidence to rebut it—evidence that, by its nature, may be different from what is needed to satisfy the statutory criteria in the Juvenile Code.

In this case, the trial court examined and rejected the constitutional issue on its own initiative in its order. But respondent concedes that he did not raise this constitutional claim in the trial court. Because this unpreserved constitutional issue was the sole basis for respondent's appeal, the Court of Appeals erred by addressing it. We reverse the decision of the Court of Appeals.

**Facts and Procedural History**

I.    **Petition, Adjudication, and Disposition**

Respondent is the father of four-year-old Katy.[1] Respondent and Katy's mother do not live together and Katy's mother had physical custody of the child, although respondent visited Katy at various times after she was born.

Shortly after Katy was born, the Alamance County Department of Social Services received a report that Katy tested positive for marijuana. During the investigation, Katy's mother also admitted to using cocaine while pregnant. Katy's mother later moved to Durham to reside with Katy's maternal grandmother. The Durham County Department of Social Services then took over the case. DSS attempted to offer services to Katy's mother to address her mental health, drug abuse, and anger management issues, but the mother declined to participate.

While Katy was still an infant, her mother caused an automobile accident while under the influence of alcohol and fled the scene. Following that incident, DSS

---

[1] Pursuant to N.C. R. App. P. 42(b), the parties stipulated to use of this pseudonym to refer to the juvenile.

established a safety plan for Katy and placed Katy with respondent. Several days later, DSS filed a petition alleging that Katy was a neglected juvenile. At the time, DSS believed respondent was a suitable placement for Katy and saw no issue with respondent caring for Katy.

Social workers handling the matter later learned that respondent had a lengthy criminal history which included convictions for driving while license revoked, assault on a female, possession of marijuana, and possession of a firearm.

Before the initial disposition hearing, respondent was arrested again, this time for assault on a female. The assault allegedly occurred outside respondent's home while Katy was nearby. After learning of this arrest, DSS changed its dispositional recommendation and requested that Katy be placed with her paternal aunt and uncle.

The trial court held a disposition hearing and, after hearing evidence, ordered that Katy be placed with her paternal aunt and uncle, with a review hearing scheduled for two weeks later.

In its disposition order, the trial court found that respondent had a "significant criminal history," including charges of assault on a female, and that he had a pending charge for assaulting his ex-girlfriend. The court also found that respondent's "description and downplay of the domestic violence incident" that led to his most recent arrest was not credible. The court further found that a video the trial court viewed of the interior of respondent's home raised concerns about respondent's living environment. The court also found that respondent "would tote his daughter around

in the car while delivering his product for his business" in a manner that was "inappropriate" for a child of that age.

Based on these findings, the trial court determined that it was in Katy's best interest to be placed temporarily with the paternal aunt and uncle, at least until the review hearing scheduled for two weeks later.

The trial court's disposition order also contained a statement that both respondent and Katy's mother "acted inconsistent with their constitutional rights as parents." It is undisputed on appeal that neither respondent nor Katy's mother ever asserted a claim on constitutional grounds in the trial court.

## II.    Court of Appeals review

On appeal to the Court of Appeals, respondent challenged the trial court's determination that he acted inconsistent with his constitutionally protected parental status. In a divided opinion, the Court of Appeals reversed the disposition order and remanded for a new hearing. The Court of Appeals majority reviewed the findings of fact in the disposition order and concluded that there "were no allegations in the petition or findings in the adjudication order that Respondent, the non-offending parent, has neglected the child, is unfit, or has acted inconsistently with his paramount constitutional right to custody of his child." *In re K.C.*, 288 N.C. App. 543, 551 (2023). The majority therefore held that the trial court lacked authority to place Katy with anyone other than respondent. *Id.* at 550–51.

The majority also held that this issue was properly preserved for appellate

review because respondent "opposed DSS's recommendation" to place Katy with the paternal aunt and uncle and instead argued that he had the ability to care for Katy. *Id.* at 545. Importantly, respondent concedes that in the trial court he "did not argue this issue as a violation of a constitutional right." To support its preservation ruling, the Court of Appeals cited its decision in *In re B.R.W.*, 278 N.C. App. 382, 399 (2021), *aff'd on other grounds*, 381 N.C. 61 (2022).

The dissent asserted that the trial court's findings concerning the constitutional standard were "premature and unnecessary to the trial court's dispositional decision awarding temporary custody to relatives." *In re K.C.*, 288 N.C. App. at 552 (Carpenter, J., dissenting). Relying on a series of unpublished Court of Appeals decisions, the dissent reasoned that, during the initial, temporary stages of these juvenile proceedings, the constitutional right was not yet implicated. Thus, the dissent reasoned, the sole appropriate question for appellate review was whether the trial court's best interests analysis was an abuse of discretion. *Id.* at 552–53. The dissent did not address the preservation issue.

DSS filed a notice of appeal based on the dissent and also petitioned for discretionary review of three additional issues that concerned the scope of the constitutional right to parent and the applicable legal test for that right at the initial stages of a juvenile proceeding. We allowed the petition for discretionary review of these additional issues.

We later entered a special order informing the parties that we were allowing

discretionary review on an additional issue: "In addition to the issues addressed in this Court's order allowing the petition for discretionary review on additional issues, the Court intends to address the following issue: Whether respondent properly preserved this constitutional issue for appellate review." *In re K.C.*, No. 142A23, ___ N.C. ___ (July 9, 2024).

We also instructed the parties to submit supplemental briefs on this additional issue, including "whether the Court of Appeals' reliance on its decision in *In re B.R.W.*, 278 N.C. App. 382, 399 (2021), conflicts with this Court's holding in *In re J.N.*, 381 N.C. 131, 133 (2022)."

## Analysis

### I. The constitutionally protected status of a parent

The Supreme Court of the United States has held it "firmly established that freedom of personal choice in matters of family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (cleaned up). Thus, there is "little doubt that the Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Id.* (cleaned up).

This Court, applying this federal precedent, has long acknowledged a parent's "constitutionally protected paramount interest in the companionship, custody, care,

and control of his or her child." *Price v. Howard*, 346 N.C. 68, 79 (1997). Because of this right, we held in *Price* that custody can be awarded to a non-parent in a family law proceeding, based on the best interests of the child, only when the parent engages in "conduct inconsistent with the parent's protected status." *Id.* We further held that "unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy" and that "other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents." *Id.*

## II.    Application of this constitutional right in juvenile cases

Because cases like *Quilloin* and *Price* concerned private parties seeking permanent custody or guardianship of a child, they did not address how the constitutional right of parents applies in juvenile cases in which the State seeks to remove a child because of abuse, neglect, or dependency.

Abuse, neglect, and dependency cases are governed by a lengthy set of statutes known as the Juvenile Code. *See* N.C.G.S. §§ 7B-100 *et seq.* One core purpose of these statutes is to "provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents." *Id.* § 7B-100(1).

In nearly all cases in which a trial court adjudicates a child abused, neglected, or dependent, the trial court's resulting disposition, even if it removes the child from the parent, will be constitutional. This is because, as we explained in *Price*,

"unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy" and many other types of conduct "also rise to this level so as to be inconsistent with the protected status of natural parents." 346 N.C. at 79. Thus, in most juvenile cases, the underlying facts that support the adjudication of abuse, neglect, or dependency also will satisfy the constitutional criteria.

Nevertheless, in the years since we decided *Price*, we have recognized that there might be rare circumstances in which the provisions of the Juvenile Code are insufficient to protect the constitutional rights of parents. *See, e.g., In re B.R.W.*, 381 N.C. at 77. In other words, there are rare cases in which, as applied to a particular parent, the Juvenile Code is unconstitutional because it does not provide sufficient protection of the parent's rights. In these rare cases, even if the Juvenile Code authorizes the trial court to remove a child from a parent, the court may not do so because the United States Constitution prohibits it. *Id.*

## III. Preservation of the constitutional argument

The recognition that the constitutional right to parent *could* be implicated in these rare juvenile cases created a preservation question that confounded the Court of Appeals for a number of years. Some of our case law observed that "the law presumes parents will perform their obligations to their children" and also "presumes their prior right to custody." *Petersen v. Rogers*, 337 N.C. 397, 403 (1994). Relying on this precedent, parents began to assert that the presumption of parental fitness

meant the trial court must assess the constitutionality of a child's removal in every case. As a result, the parents argued, the issue always was preserved for appellate review, even if the parent never raised it.

Ultimately, we rejected this argument and held that *Petersen* did not "negate our rules on the preservation of constitutional issues." *In re J.N.*, 381 N.C. at 133. "Thus, a parent's argument concerning his or her paramount interest to the custody of his or her child, although afforded constitutional protection, may be waived on review if the issue is not first raised in the trial court." *Id.*

At the same time, a line of cases developed in the Court of Appeals holding that this constitutional argument was preserved so long as the parent opposed removal of the child on *any* grounds, even if the parent never expressly asserted a constitutional argument. *See In re B.R.W.*, 278 N.C. App. at 397; *In re X.D.P-S.*, No. COA21-109, slip op. at 4 (N.C. Ct. App. Oct. 19, 2021) (unpublished) (citing *In re B.R.W.* for the proposition that "when a parent presents evidence opposing a recommendation of guardianship, the parent sufficiently preserves the constitutional issue"); *In re A.N.*, No. 22-498, slip op. at 8 (N.C. Ct. App. June 6, 2023) (unpublished) (citing *In re B.R.W.* for the proposition that the constitutional issue was preserved because the parent "requested the trial court reject the recommendation of guardianship").

This line of cases began with *In re B.R.W.*, in which the Court of Appeals acknowledged that the parent did not expressly raise an argument on constitutional grounds. Nevertheless, the trial court made a finding that the parent was "unfit" and

"acted in a manner inconsistent with [the parent's] constitutionally protected status." 278 N.C. App. at 395. In the lead opinion, a single Court of Appeals judge stated that the parent had preserved the issue because she "presented evidence regarding her ability to care for the children, opposed the recommendation of guardianship, and requested that the trial court reject the recommendation of guardianship and allow a trial home placement." *Id.* at 399.

A second judge concurred in the judgment but questioned the preservation discussion, noting that it appeared to conflict with other Court of Appeals case law "concerning when and how the constitutional issue of whether parents have acted inconsistently with their constitutionally protected rights must be raised and preserved in the trial court." *Id.* at 410 (Dietz, J., concurring). A third judge dissented on other issues and did not address the preservation issue. *Id.* at 410–16. (Carpenter, J., dissenting).

The parent filed a notice of appeal based on the dissent, but no party sought discretionary review on the preservation issue. This Court affirmed the Court of Appeals without addressing preservation. *In re B.R.W.*, 381 N.C. at 93.

But *on the same day* that this Court issued its decision in *In re B.R.W.*, we also issued the decision in *In re J.N.* which, as noted above, squarely addressed the preservation issue that divided the Court of Appeals in *In re B.R.W.* and many other cases.

In *In re J.N.*, we held that parents must raise the constitutional issue in the

trial court to preserve it for appellate review. 381 N.C. at 133. Importantly, as in *In re B.R.W.*, the parent in *In re J.N.* had opposed DSS's recommendation of guardianship in the trial court and argued that "reunification would be a more appropriate plan." *Id.* at 134. But, we noted, the parent never argued that the guardianship "would be inappropriate *on constitutional grounds.*" *Id.* (emphasis added). We therefore held that "respondent waived the argument for appellate review." *Id.*

Thus, under *In re J.N.*, a parent who merely argues against a child's removal, or against the child's placement with someone else, does not adequately preserve the constitutional issue. To preserve it, the parent must inform the trial court and the opposing parties that the parent is challenging the removal on constitutional grounds and articulate the basis for the constitutional claim.

This preservation requirement is necessary for a crucial reason. As noted above, the argument is essentially a claim that the Juvenile Code is unconstitutional as applied to that parent. After all, the argument applies only when the Juvenile Code *authorizes* the removal of the child from the parent's care, but the Constitution nevertheless *prohibits* it. Thus, the parties opposing the parent's argument must be given notice of the constitutional challenge so that they can present evidence to rebut it. *Price*, 346 N.C. at 79. This evidence, by its nature, may be different from the evidence those parties present to establish grounds for removal under the Juvenile Code—after all, the constitutional claim can prevail only in rare cases where the

evidence that is sufficient to satisfy the Juvenile Code nevertheless is insufficient to comply with the constitutional criteria.

Moreover, because of this need to provide notice to the opposing parties, the preservation requirement applies even if the trial court addresses the constitutional claim on its own initiative in its order. A trial court's findings are limited to evidence in the record. *In re L.N.H.*, 382 N.C. 536, 546 (2022). Without notice that the parent is asserting a constitutional claim, the opposing parties will not know that they must present evidence that would support the necessary findings to reject the claim. *Price*, 346 N.C. at 79.

In sum, the Court of Appeals' preservation analysis in *In re B.R.W.* did not survive our holding in *In re J.N.* To prevent further confusion, we expressly overrule the preservation holding of the Court of Appeals decision in *In re B.R.W.* and the holdings of the resulting Court of Appeals case law that followed it.

Having reaffirmed the applicable preservation standard, we turn to the facts of this case. Here, respondent concedes that he "did not argue this issue as a violation of a constitutional right." Thus, under *In re J.N.*, the constitutional claim is not preserved for appellate review. Because this was the sole issue raised by respondent in the Court of Appeals, and because the issue is waived as a matter of law and not subject to appellate review, we reverse the decision of the Court of Appeals. As a result, we do not reach the remaining arguments presented to us in this appeal.

Finally, some words about the dissent. The dissent accuses us of "advocating"

rather than objectively deciding this appeal. This is so, the dissent argues, because we examined whether the key constitutional issue in the case was preserved for appellate review. The parties raised that issue in their Court of Appeals briefing but did not do so in their filings with this Court. The dissent therefore asserts that it was improper for us to consider it.

This is a flawed argument for several reasons. First, it is well-settled from precedent dating back nearly a century that "this Court is not required to pass upon a constitutional issue unless it affirmatively appears that the issue was raised and determined in the trial court." *State v. Creason*, 313 N.C. 122, 127 (1985) (collecting cases). This rule applies regardless of whether the opposing party asserts in its appellate briefing that the constitutional issue was waived. *See City of Durham v. Manson*, 285 N.C. 741, 743 (1974). As we have repeatedly explained, when a constitutional issue "was not raised in the trial court but was injected for the first time on appeal to the Court of Appeals" that issue "was not properly before the Court of Appeals" and therefore is "not properly before us." *Id.*

Even putting this precedent aside, we are the court of last resort in our State. This Court is tasked with allowing discretionary review "on its own motion" when a "decision of the Court of Appeals appears likely to be in conflict with a decision of the Supreme Court." N.C.G.S. § 7A-31(a). We do this because it is our responsibility to ensure the consistency of the State's jurisprudence and prevent competing lines of precedent from lingering and causing confusion in the lower courts. As explained

above, the Court of Appeals decision in this case, and the line of cases it followed, conflicts with our holding in *In re J.N.*

We therefore entered a unanimous order (joined by our dissenting colleagues) accepting discretionary review of this issue. *In re K.C.*, No. 142A23, ___ N.C. ___ (July 9, 2024). Addressing this lingering conflict in our jurisprudence is not advocacy; it is this Court performing its central role as the Supreme Court of North Carolina.

## Conclusion

We reverse the decision of the Court of Appeals.

REVERSED.

Justice RIGGS dissenting.

In a case where, until supplemental briefing requested by this Court, no party argued to this Court that Father waived his constitutional challenge and contrary to our settled practice, the majority steps into the role of advocate and makes a "better" argument for a party. Here, the majority intervenes as such to rule that a parent may only preserve a constitutional challenge in a juvenile proceeding by informing the trial court and the opposing parties of such a challenge and providing an articulable basis for that constitutional challenge. In an improper vehicle, the majority delivers on a request from the Court of Appeals three years ago in *In re B.R.W.*, 278 N.C. App. 382, 410 (2021) (Dietz, J., concurring) ("[T]his Court could benefit from the guidance of our Supreme Court concerning when and how the constitutional issue of whether parents have acted inconsistently with their constitutionally protected rights must be raised and preserved in the trial court."). The majority then steps in to answer its own posed question by adopting a harsh, unforgiving procedural rule for constitutional claims argued in juvenile court. I respectfully dissent.

## I. Appellate Review Under Rule 16

Our appellate review is limited "to consideration of the issues stated in . . . the petition for discretionary review and the response thereto . . . and properly presented

in the new briefs." N.C. R. App. P. 16(a). And for appeals based on dissents, this Court's review is "limited to consideration of those issues that are (1) specifically set out in the dissenting opinion as the basis for that dissent, (2) stated in the notice of appeal, and (3) properly presented in the new briefs."[1] N.C. R. App. P. 16(b). Here, as the majority points out, we are reviewing DSS's dissent-based appeal as well as additional issues on which we allowed discretionary review. But until this Court requested supplemental briefing, issue preservation had not been properly raised before this Court. Issue preservation was not addressed in the dissent, not addressed in the notice of appeal, not addressed in the petition for discretionary review, and not addressed in the new briefs. We are jurists, not advocates. Because no party argued that Father failed to preserve his constitutional claim, this Court should have addressed the merits of this appeal.

Even if Father did not preserve his constitutional claim, though, the majority ignores that we can nevertheless address the merits of this appeal under Rule 2. *See* N.C. R. App. P. 2 ("To prevent manifest injustice to a party, or to expedite decision in the public interest, either court of the appellate division may . . . suspend or vary the

---

[1] The majority claims that precedent and statutory law say otherwise, but those arguments are not compelling here. Neither of the cases cited, *State v. Creason*, 313 N.C. 122 (1985), or *City of Durham v. Manson*, 285 N.C. 741 (1974), speak to the situation here, when a party fails to properly submit an issue for consideration by this Court. As explained in this dissent, Rule 16(a) and (b) dictate the outcome here. Moreover, Section 7A-31 merely addresses when this Court may certify a *cause*, i.e., a case, for review rather than when this Court may consider an *issue* for review. *See Cause*, Garner's Dictionary of Legal Usage 142 (3d ed. 2011) ("*Case* is more commonly used, to be sure, but *cause* (= lawsuit) has long been current in the speech and writing of lawyers.").

requirements or provisions of any of these rules . . . .").  Our precedent recognizes that we may consider unpreserved issues in the interest of justice.  *See Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460, 463 (1984) ("However, in the interest of justice we will consider this issue and the other issues raised by plaintiffs' brief and argument [that were not properly raised at trial].").

Notwithstanding the ruling in this case, Appellate Rule 2 still allows for this Court to "suspend the appellate rules either upon application of a party or upon its own initiative."  *Bailey v. State*, 353 N.C. 142, 157 (2000) (cleaned up).  Rule 2 specifically "relates to the residual power of our appellate courts to consider, in exceptional circumstances, significant issues of importance in the public interest, or to prevent injustice which appears manifest to the Court and only in such instances." *Steingress v. Steingress*, 350 N.C. 64, 66 (1999) (citing *Blumenthal v. Lynch*, 315 N.C. 571, 578 (1986)).  "[W]hether an appellant has demonstrated that [their] matter is the rare case meriting suspension of our appellate rules is always a discretionary determination to be made on a case-by-case basis."  *State v. Campbell*, 369 N.C. 599, 603 (2017) (citing *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 196 (2008)).  While I believe the parties waived issue preservation questions, even if the question was not waived, addressing Father's constitutional claim would certainly prevent an injustice—being stripped of his parental right to custody without due process.  If Rule 2 needed to be invoked, I believe Father presents "the rare case meriting suspension" of our preservation requirement.  *Id.*

## II.    Father's Constitutional Right to Parent

In his principal brief, Father argued that the trial court's decision to deprive him of custody of Katy in favor of nonparents violated Father's constitutionally protected rights as a parent.  Because no party nor the dissenting judge at the Court of Appeals contended that Father failed to preserve his constitutional claim, this Court should have addressed the merits of that argument.  I do so below and conclude that we should have affirmed the Court of Appeals' decision and remanded this case to the trial court for more findings as to whether the Father's parenting negatively affected Katy.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits this State from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, cl. 1.  According to the Supreme Court of the United States, "perhaps the oldest of the fundamental liberty interests" triggering due process protections are "the interests of parents in the care, custody, and control of their children."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").  This Court has expressed similar sentiments.  *See Petersen v. Rogers*, 337 N.C. 397, 402 (1994) ("North Carolina's recognition of the paramount right of parents to custody, care, and nurture of their children antedates

the constitutional protections set forth [by the Supreme Court of the United States].").

Because these constitutional lodestars warrant due process protections, they "do[ ] not evaporate simply because [parents] have not been [flawless] or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also Owenby v. Young*, 357 N.C. 142, 146 (2003) ("[The] Due Process Clause of the Fourteenth Amendment ensures that the government does not impermissibly infringe upon a natural parent's paramount right to custody solely to obtain a better result for the child."). This legal principle is further bolstered by the presumption that if "parents [ ] perform their obligations to their children," they possess a "prior right to custody." *Petersen*, 337 N.C. at 403 (quoting *In re Hughes*, 254 N.C. 434, 436–37 (1961)). Under this presumption, "the constitutionally-protected paramount right of parents to custody, care, and control of their children *must* prevail." *Petersen*, 337 N.C. at 403–04 (emphasis added). This presumption especially "favor[s] a parent in a custody dispute with a non-parent." *Routten v. Routten*, 374 N.C. 571, 576 (2020) (emphasis removed).

Yet that presumption "is not absolute." *In re R.T.W.*, 359 N.C. 539, 543 (2005) (citing *David N. v. Jason N.*, 359 N.C. 303, 305 (2005)). This Court has long acknowledged "parental rights and parental responsibilities as two sides of the same coin." *Id.* (citing 1 Blackstone, Commentaries 434–40); *see also David N.*, 359 N.C. at 305 ("[W]hile a fit and suitable parent is entitled to the custody of his child, it is equally true that where fitness and suitability are absent he loses this right."). Thus,

the State may take a parent's child away by "showing that the parent is unfit to have custody or where the parent's conduct is inconsistent with his or her constitutionally protected status." *In re E.B.*, 375 N.C. 310, 315 (2020) (quoting *Adams v. Tessener*, 354 N.C. 57, 62 (2001)). While "unfitness, neglect, and abandonment" facially undermine the parent's status, "other types of conduct . . . can also rise to this level so as to be inconsistent with the protected status of natural parents." *Boseman v. Jarrell*, 364 N.C. 537, 549 (2010) (cleaned up) (quoting *Price*, 346 N.C. at 79).

Notably, though, that is the only way a parent may lose their child to the State. *Id.* (emphasis added); *see also* Becca Pearson, *The Price to Parent*, 102 N.C. L. Rev. 1299, 1309 (2024) ("There must be a very substantial reason before parental custody can be terminated by the State." (cleaned up)). And because "there is no bright line beyond which a parent's conduct meets this standard," *Boseman*, 364 N.C. at 549, all allegedly inconsistent conduct "must be viewed on a case-by-case basis." *Owenby*, 357 N.C. at 147 (quoting *Price*, 346 N.C. at 79). Indeed, we must "examine each case individually in light of all of the relevant facts and circumstances and the applicable legal precedent." *In re B.R.W.*, 381 N.C. 61, 82 (2022); *see also id.* at 83 ("In conducting the required analysis, 'evidence of a parent's conduct should be viewed cumulatively.'" (quoting *Owenby*, 357 N.C. at 147)). Only after a trial court concludes that a parent has acted in a manner inconsistent with their parental status may the "best interest of the child test . . . be applied without offending the Due Process Clause." *Owenby*, 357 N.C. at 146 (internal citation omitted); *see also Price v.*

*Howard*, 346 N.C. 68, 79 (1997) ("If a natural parent's conduct has not been inconsistent with his or her constitutionally protected status, application of the 'best interest of the child' standard in a custody dispute with a nonparent would offend the Due Process Clause.").

Further, "a trial court's determination that a natural parent has acted in a way inconsistent with his constitutionally protected status must be supported by clear and convincing evidence." *David N.*, 359 N.C. at 307 (quoting *Adams*, 354 N.C. at 63). The clear and convincing standard "is more exacting than the preponderance of the evidence standard generally applied in civil cases" and "requires evidence that should *fully* convince." *In re I.K.*, 377 N.C. 417, 421 (2021) (emphasis added) (quoting *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 721 (2009)). If a finding is "unsupported by the record," we "simply disregard[ ] [that] finding[ ] and examine[ ] whether the remaining findings support the trial court's determination." *In re A.J.L.H.*, 384 N.C. 45, 48 (2023).

The trial court adjudicated Katy a neglected child on 15 October 2021, but as Father correctly explains, that adjudication only addressed Mother's neglect of Katy. But even the existing findings in the trial court's disposition order on 8 February 2022 are insufficient to demonstrate that Father is unfit or that his conduct was inconsistent with his constitutionally protected status.[2] Thus, the majority

---

[2] We note that the trial court also incorrectly labeled Finding 61—that Father "acted inconsistent with [his] constitutional right as [a] parent[ ]"—a finding of fact. *See In re B.R.W.* at 77 ("A trial court's determination that a parent has acted inconsistently with his or her

implicates significant Due Process Clause concerns by even reaching the "best interest of the child" standard.

Only a fraction of the trial court's findings of fact in the disposition order address Father or his conduct. The trial court found that Father was formerly convicted "for drug-related crimes and assault on a female" and was charged with multiple offenses while the instant petition was pending, including "communicating threats and larceny of a firearm" and "assault on a female," but no evidence was specifically developed on these matters. No one testified at trial about any of Father's convictions or charges, nor were any details included in the DSS court report or any addendums.

Also, while Father was arrested for domestic violence charges against a woman in November 2021, this kind of alleged incident is insufficient to undermine Father's constitutionally protected status. *See Price*, 346 N.C. at 79 (holding that a parent's behavior is inconsistent with their right to parent "if he or she fails to shoulder the responsibilities that are attendant to rearing a child"). As the Court of Appeals noted, Father's charge was still pending at the disposition hearing, and Father consistently maintained his innocence. *See In re K.C.*, 288 N.C. App. 543, 551 (2023) ("[W]e are unable to say that . . . the existence of an unproven domestic violence charge warrant[s] forfeiture of [Father's] constitutionally protected status."). Further, there

constitutionally protected status as the parent is [a conclusion of law] subject to de novo review.").

was no evidence that Katy witnessed the incident. According to Father, the incident occurred outside, and Katy was inside the back room of the house. Family court cannot be a place where the presumption of innocence in criminal matters falls by the wayside.

Besides Father's alleged criminal history, the trial court also considered the condition of Father's home and the nature of his job. Yet neither of these findings support a conclusion that Father was unfit to parent Katy. First, the trial court made no finding of fact concerning the impact of the condition of Father's home on Katy. *See* N.C.G.S. § 7B-101(15) (2023) (defining a neglecting parent as one who "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare"); *see also In re C.L.*, No. COA11-98, slip op. at 7 (N.C. Ct. App. July 19, 2011) (unpublished) ("The trial court did not make any findings about specific risks that might result from the condition of the home, nor did the court find that the condition of the home contributed to any particular impairment or risk of impairment to the children."). For example, as Father explains, "[t]here was no reported filth or bug infestations or other problems . . . that would have subjected Katy to a dangerous environment." In particular, Finding 56 states that "[t]he [c]ourt was disturbed by what she saw at [Father's] house during the video testimony," but does not provide any additional detail. In comparison to other cases from this Court, this finding is plainly insufficient to support a conclusion of unfitness. *See In re I.K.*, 377 N.C. 417, 426–28 (2021) (agreeing that clear and convincing evidence existed supporting a

finding of unsafe living conditions where "the clutter in the home was piled to the ceiling in some areas and there were holes in the floor of the home covered with plywood"). Further, the DSS social worker testified that the Father always secured housing for Katy that was approved by DSS.

Second, the trial court's findings about the Father's clothing, employment, and tendency to move should not have been considered because they all relate to the Father's socioeconomic status. *See Dunn v. Covington*, 272 N.C. App. 252, 265 (2020) ("[S]ocioeconomic factors such as the quality of a parent's residence, job history, or other aspects of their financial situation . . . have no bearing on the question of fitness."); *see also Raynor v. Odom*, 124 N.C. App. 724, 731 (1996) ("[S]ocioeconomic status is irrelevant to a fitness determination . . . ." (citing *Jolly v. Queen*, 264 N.C. 711, 713–14 (1965))). Refraining from such considerations is critical to protecting the interests of "honest, industrious parents," regardless of their income status. *Jolly*, 264 N.C. at 715; *see also Bost v. Van Nortwick*, 117 N.C. App. 1, 8–9 (1994) ("[T]he finding that [a non-parent] could provide a more stable environment and better financial situation . . . does not mandate that respondent's rights as the natural father . . . be terminated."). Thus, these findings were impermissible for the trial court to rely on in concluding that Father was unfit to parent Katy.

### III. Conclusion

At bottom, under the umbrella of rights that parents enjoy is the right to temporarily entrust their child to the care of trusted family and friends. The

majority's failure to address the merits is particularly pernicious here. As a society, we should want to encourage parents getting the help they need, whether it be for addiction or mental health treatment or the ability to regain financial footing. If this Court punishes a parent's thoughtful decision to make temporary, informal custody arrangements in order to advance the wellbeing of the entire family unit, we will disincentivize that kind of good parenting. Parents will not get the help they need if they will lose custody of their child because of those thoughtful decisions.

This is not to say that, upon proper investigation and substantiation, Father's criminal history and housing conditions could not be considered in relation to his constitutional right to parent. *See In re A.J.*, 386 N.C. 409, 417 (2024) ("[W]hen an appellate court determines that the trial court's findings of fact are insufficient, the court must examine whether there is sufficient evidence in the record that could support the necessary findings." (citing *In re K.N.*, 373 N.C. 274, 284 (2020)). Thus, I would affirm the Court of Appeals' judgment and remand this matter back to the trial court to "decide whether to enter a new order with sufficient findings based on the record or to change its conclusions of law because the court cannot make the necessary findings." *Id.* (citing *In re K.N.*, 373 N.C. at 284–85).

Justice EARLS joins in this dissenting opinion.